CORRIGAN, J.
In these consolidated appeals, we are called upon to determine whether 11-carboxy-THC, a “metabolite” or byproduct of metabolism created when the body breaks down THC (tetrahydrocannabinol), the psychoactive ingredient of marijuana, is a schedule 1 controlled substance under MCL 333.7212 of the Public *320 Health Code. We hold that it is. Thus, a person operating a motor vehicle with 11-carboxy-THC in his or her system may be prosecuted under MCL 257.625(8), which prohibits the operation of a motor vehicle with any amount of a schedule 1 controlled substance in the body.
Additionally, in Docket No. 129269, we clarify our decision in People v Schaefer, 473 Mich 418; 703 NW2d 774 (2005), and hold that, in a prosecution under MCL 257.625(8), a prosecutor is not required to prove beyond a reasonable doubt that the defendant knew that he or she might be intoxicated. Rather, the prosecutor need only prove that the defendant had any amount of a schedule 1 controlled substance in his or her body. Accordingly, we reverse the judgment of the Court of Appeals and remand both cases to the trial courts for further proceedings consistent with this opinion.
I. FACTUAL BACKGROUND
In Docket No. 129269, defendant Delores M. Derror was driving east on snow- and slush-covered M-72 when she crossed into oncoming traffic and collided with another vehicle, killing the front-seat passenger, paralyzing two children in the rear seat, and injuring a third child. The accident occurred at approximately 6:00 p.m. Derror admitted that she had smoked marijuana, at 2:00 p.m., earlier that day. Two blood samples were taken, one at approximately 8:00 p.m. and one at approximately 11:00 p.m. The first blood sample reflected 38 nanograms of 11-carboxy-THC per milliliter, and the second contained 31 nanograms of 11-carboxy-THC per milliliter. Derror was charged with operating a motor vehicle with the presence of a schedule 1 controlled substance in her body, causing death and serious *321 injury, under MCL 257.625(4), (5), and (8). Derror was also charged with possession of marijuana, MCL 333.7403(2)(d).
In Docket No. 129364, defendant Dennis Kurts was stopped at approximately 9:00 p.m. for driving erratically. The officer smelled the odor of alcohol on Kurts. Kurts also had glassy, bloodshot eyes. Kurts admitted consuming two beers. During a pat-down search, the officer found a marijuana pipe in Kurts’ pocket. Kurts then admitted that he had smoked marijuana a half-hour earlier. A blood sample was taken at approximately 10:00 p.m. Tests revealed that his blood contained eight nanograms of 11-carboxy-THC per milliliter and 0.07 grams of alcohol per 100 milliliters. Kurts was charged with operating a motor vehicle while intoxicated, third offense, MCL 257.625(9); operating a motor vehicle with the presence of a schedule 1 controlled substance in the body, MCL 257.625(8); and operating a vehicle with a suspended or revoked license, MCL 257.904(3)(a).
Pretrial evidentiary hearings were held in both cases in which expert testimony regarding the characteristics of marijuana, THC, and 11-carboxy-THC was introduced. The Court of Appeals summarized this expert testimony as follows:
The experts agreed that carboxy THC is a “metabolite,” or byproduct of metabolism, created in the human body during the body’s biological process of converting marijuana into a water-soluble form that can be excreted more easily. Its presence in the blood conclusively proves that a person ingested THC at some point in time. However, carboxy THC itself has no pharmacological effect on the body and its level in the blood correlates poorly, if at all, to an individual’s level of THC-related impairment. In fact, carboxy THC could remain in the blood long after all THC has gone, as THC quickly leaves the blood and enters the *322 body’s tissues. [People v Derror (On Reconsideration), 268 Mich App 67, 71-72; 706 NW2d 451 (2005).]
The prosecution expert in Derror, Dr. Michelle Glinn, further testified, without dispute:
THC is taken up into the brain and into fat cells and into other tissues, and it leaves its effects on the brain and central nervous system for quite a while after it’s not detectible in the blood any further.
The effects of — it causes chemical changes in the brain, basically, that persist for quite a while. And you can document defects in lab studies of THC beyond the time when it’s no longer detectible in the blood.
In discussing the structural differences between THC and 11-carboxy-THC, Dr. Glinn explained, also without dispute, that THC and 11-carboxy-THC are identical except that in 11-carboxy-THC, two oxygen atoms are added to, and three hydrogen atoms are removed from, the eleventh carbon to make it more water soluble and easier to excrete.
Following the evidentiary hearings, the trial courts in both cases determined that the Legislature did not intend to include 11-carboxy-THC as a schedule 1 controlled substance because it has no pharmacological effect on the human body. The trial courts, however, reached divergent results regarding the effect of this conclusion. In Kurts, the trial court granted Kurts’s motion to dismiss the charge of operating a motor vehicle while under the influence of a schedule 1 controlled substance in violation of MCL 257.625(8) on the grounds of insufficient evidence. In Derror, however, the trial court ruled that, although 11-carboxy-THC is not itself a schedule 1 controlled substance, evidence of 11-carboxy-THC in Derror’s blood at the time of testing may be presented to the jury as circum *323 stantial evidence to establish that Derror had THC in her blood at the time of driving.
The prosecutors in both cases appealed to the Court of Appeals, which consolidated the appeals and affirmed the trial courts’ rulings that 11-carboxy-THC is not a schedule 1 controlled substance.[1] In Kurts, the Court of Appeals also reversed the trial court’s dismissal of the MCL 257.625(8) charge, concluding that although only 11-carboxy-THC was found in Kurts’s blood, evidence existed from which a jury could conclude that Kurts had THC in his blood at the time that he was driving.[2] The Court of Appeals reached this conclusion because Kurts admitted that he had smoked marijuana one half-hour before he was arrested, and because the expert testimony revealed that the presence of 11-carboxy-THC in a person’s body conclusively establishes prior ingestion of THC.
The prosecutors in both cases applied for leave to appeal the Court of Appeals determination that 11-carboxy-THC is not a schedule 1 controlled substance within the meaning of MCL 257.625(8). In Docket No. 129269, the prosecutor also sought leave to appeal the Court of Appeals determination that, in a prosecution involving MCL 257.625(8), a prosecutor must prove that the defendant knew he or she might be intoxicated. We granted both applications and ordered that the cases be submitted together.[3]
II. STANDARD OF REVIEW
Whether 11-carboxy-THC is a schedule 1 controlled substance under MCL 333.7212 of the Public Health *324 Code for the purpose of MCL 257.625(8) is a matter of statutory interpretation. Statutory interpretation is a question of law that is reviewed by this Court de novo. People v Schaefer, 473 Mich 418, 427; 703 NW2d 774 (2005), citing People v Moore, 470 Mich 56, 61; 679 NW2d 41 (2004), and People v Babcock, 469 Mich 247, 253; 666 NW2d 231 (2003). When interpreting statutes, our goal is to give effect to the intent of the Legislature by applying the plain language of the statute. People v Koonce, 466 Mich 515, 518; 648 NW2d 153 (2002).
Whether, in a prosecution involving MCL 257.625(8), the prosecutor must prove beyond a reasonable doubt that the defendant knew that he or she might be intoxicated is also a question of law that we review de novo. Schaefer, supra at 427.
III. ll-CARBOXY-THC IS A SCHEDULE 1 CONTROLLED SUBSTANCE UNDER MCL 333.7212(l)(d)
MCL 257.625(8), which both Kurts and Derror were charged with violating, prohibits the operation of a vehicle while a controlled substance is present in the body. It provides, in relevant part:
A person ... shall not operate a vehicle ... within this state if the person has in his or her body any amount of a controlled substance listed in schedule 1 under section 7212 of the public health code, 1978 PA 368, MCL 333.7212, or a rule promulgated under that section ....
MCL 333.7212(l)(c) specifically lists marijuana as a schedule 1 controlled substance, except for certain exceptions not applicable to these cases.
The term “marijuana” is defined in MCL 333.7106(3) as follows:
“Marihuana” means all parts of the plant Canabis [sic] sativa L., growing or not; the seeds thereof; the resin *325 extracted from any part of the plant; and every compound, manufacture, salt, derivative, mixture, or preparation of the plant or its seeds or resin.
In addition to specifically listing marijuana, MCL 333.7212(l)(d) and (e) provide that the following substances also qualify as schedule 1 controlled substances:
(d) Except as provided in subsection (2), synthetic equivalents of the substances contained in the plant, or in the resinous extractives of cannabis and synthetic substances, derivatives, and their isomers with similar chemical structure or pharmacological activity, or both, such as the following, are included in schedule 1:
(i) A1 cis or trans tetrahydrocannabinol, and their optical isomers.
(ii) A6 cis or trans tetrahydrocannabinol, and their optical isomers.
(iii) A3,4 cis or trans tetrahydrocannabinol, and their optical isomers.
(e) Compounds of structures of substances referred to in subdivision (d), regardless of numerical designation of atomic positions, are included.
The Court of Appeals held that 11-carboxy-THC was not a schedule 1 controlled substance under MCL 333.7212(l)(c) because it is not expressly listed in the statute. The Court of Appeals, however, failed to consider other provisions of the Public Health Code in reaching its conclusion; specifically, the provision that defines marijuana. While MCL 333.7212(l)(c) does not specifically list 11-carboxy-THC as a schedule 1 controlled substance, it does list marijuana. As stated above, the Public Health Code includes within the definition of marijuana every compound and derivative of the plant or its seeds or resin.
THC is the main psychoactive substance found in the cannabis plant. 11-carboxy-THC is a metabolite of THC *326 in that it is produced when the body metabolizes THC. See Stedman’s Online Medical Dictionary, which defines “metabolite” as “[a]ny product or substrate (foodstuff, intermediate, waste product) of metabolism, especially of catabolism.”[4] The question presented before us is whether 11-carboxy-THC is also a derivative of THC.
We hold that the term “derivative” encompasses metabolites. We construe “all words and phrases... according to the common and approved usage of the language,” but give terms of art and “technical words and phrases” any “peculiar and appropriate meaning” ascribed by the Legislature or acquired in common usage in the absence of legislative definition. MCL 8.3a; Schaefer, supra at 435. In the context of this case, the term “derivative” is a scientific term, definable only by reference to scientific dictionaries.
Medical dictionaries have defined the term “derivative” in a variety of ways. Stedman’s Online Medical Dictionary defines a “derivative” as “[sjomething produced by modification of something preexisting,” or “[sjpecifically, a chemical compound that may be produced from another compound of similar structure in one or more steps, as in replacement of H by an alkyl, acyl, or amino group.”[5] Under the first part of this definition, 11-carboxy-THC qualifies as a derivative because it is produced when the body breaks down or naturally modifies THC. 11-carboxy-THC also qualifies as a derivative under the second part of this definition because it is a chemical compound produced when the body metabolizes THC, which is a compound of similar *327 structure. It is undisputed that THC and 11-carboxy-THC are identical except that in 11-carboxy-THC, two oxygen atoms are added to and three hydrogen atoms are removed from the eleventh carbon to make it more water soluble and easier to excrete.
Merriam-Webster’s Online Medical Dictionary defines a “derivative” as “something that is obtained from, grows out of, or results from an earlier or more fundamental state or condition,” or “a chemical substance related structurally to another substance and theoretically derivable from it,” or “a substance that can be made from another substance.”[6] The first and third parts of this definition are as broad as the one from Stedman’s and would include 11-carboxy-THC because it is produced from THC; it results from the metabolization of THC. The second of the three parts of this definition, however, is more limited in that it includes only “a chemical substance related structurally to another substance____” 11-carboxy-THC also fits within this definition because, as stated above, it has an identical chemical structure to THC except for the eleventh carbon atom.
Defendants agree that 11-carboxy-THC potentially qualifies as a derivative under the above definitions, but contend that defining the term “derivative” broadly under the Public Health Code would produce nonsensical results because it would include almost every chemical substance, including carbon dioxide, which is also a metabolite of THC. We agree that most of the above definitions of “derivative” would encompass metabolites such as carbon dioxide. Not all of the above definitions, however, do so. The second part of the Merriam-Webster’s Online Medical Dictionary describes *328 a “derivative” as a “chemical substance related structurally to another substance and theoretically derivable from it.” This definition seems to include 11-carboxy-THC as a derivative of THC because it is related structurally to THC, but the definition is not so broad as to include other metabolites such as carbon dioxide.
Given these divergent definitions, we must choose one that most closely effectuates the Legislature’s intent. Stanton v Battle Creek, 466 Mich 611, 618; 647 NW2d 508 (2002).[7] In doing so, we apply the definition of the term “derivative” as defined in the second part of *329 the Merriam-Webster’s Online Medical Dictionary. As stated above, this definition includes 11-carboxy-THC as a derivative of THC because it is related structurally to THC, but is not so broad as to include other metabolites such as carbon dioxide. Moreover, this definition is consistent with the purpose of the Public Health Code to protect the health, safety, and welfare of the people of this state.[8]
The Court of Appeals further held, and the dissent agrees, that 11-carboxy-THC was not a schedule 1 controlled substance because it has no pharmacological effect on the human body. Contrary to the Court of Appeals holding and the dissent’s contention, neither MCL 257.625(8) nor MCL 333.7212 requires that a substance have pharmacological properties to constitute a schedule 1 controlled substance. Nor does MCL 257.625(8) require that a defendant be impaired while driving. Rather, it punishes for the operation of a motor *330 vehicle with any amount of a schedule 1 controlled substance in the body.[9] The Legislature expressly listed marijuana as a schedule 1 controlled substance. The Legislature expressly included the term “derivative” within the definition of “marijuana.” It is not our place to second-guess the Legislature’s intent when the language in the statute is plain and unambiguous.[10] Koonce, supra at 518. The Legislature undoubtedly has the power to, and often does, criminalize activity that is *331 not itself necessarily dangerous or illegal because it is closely related to activity that is dangerous or illegal.[11]
The Court of Appeals also held that 11-carboxy-THC was not a schedule 1 controlled substance under MCL 333.7212(l)(d) because it is a natural, rather than a synthetic, byproduct of THC. Regardless of whether MCL 333.7212(l)(d) applies to synthetic substances only, 11-carboxy-THC qualifies as a schedule 1 controlled substance under MCL 333.7212(l)(c) and, thus, we need not apply subsection 1(d).
Because 11-carboxy-THC qualifies as a derivative, and since derivatives are included within the definition of marijuana, which MCL 333.7212(l)(c) specifically lists as a schedule 1 controlled substance, we hold that 11-carboxy-THC is a schedule 1 controlled substance under MCL 333.7212(l)(c) for the purpose of MCL 257.625(8). We, therefore, reverse the Court of Appeals judgment that held that 11-carboxy-THC is not a schedule 1 controlled substance, and remand both cases to the trial courts for further proceedings consistent with this opinion.
IV MCL 257.625(4), (5), AND (8) DO NOT REQUIRE PROOF OF A DEFENDANT’S KNOWLEDGE OF HIS OR HER INTOXICATION
In Docket No. 129269, defendant Derror was charged with violating both MCL 257.625(4) and (5), in addition to subsection 8. Subsections 4 and 5 provide for an enhanced sentence for causing death or serious impair *332 ment of a body function while operating a motor vehicle with any schedule 1 controlled substance in the body. MCL 257.625 states, in relevant part:
(4) A person, whether licensed or not, who operates a motor vehicle in violation of subsection (1), (3), or (8) and by the operation of that motor vehicle causes the death of another person is guilty of a crime ....
(5) A person, whether licensed or not, who operates a motor vehicle in violation of subsection (1), (3), or (8) and by the operation of that motor vehicle causes a serious impairment of a body function of another person is guilty of a felony....
(8) A person, whether licensed or not, shall not operate a vehicle... if the person has in his or her body any amount of a controlled substance listed in schedule 1 under section 7212 of the public health code ....
In interpreting the above provisions, the trial court held that the prosecutor had to prove that Derror’s intoxication was a proximate cause of the accident. The Court of Appeals originally affirmed this holding, relying on People v Lardie, 452 Mich 231, 256; 551 NW2d 656 (1996), in which this Court held that MCL 257.625(4) “requires the people to prove that a defendant, who kills someone by driving while intoxicated, acted knowingly in consuming an intoxicating liquor or a controlled substance, and acted voluntarily in deciding to drive after such consumption.” Id. at 256. The Lardie Court further noted that “the statute must have been designed to punish drivers when their drunken driving caused another’s death.” Id. at 257 (emphasis in original).
We, however, subsequently overruled portions of the Lardie case in the companion cases of People v Schaefer *333 and People v Large, 473 Mich 418; 703 NW2d 774 (2005). In these companion cases we held:
Section 625(4) plainly requires that the victim’s death be caused by the defendant’s operation of the vehicle, not the defendant’s intoxicated operation. Thus, the manner in which the defendant’s intoxication affected his or her operation of the vehicle is unrelated to the causation element of the crime. The defendant’s status as “intoxicated” is a separate element of the offense used to identify the class of persons subject to liability under § 625(4). [Id. at 433 (emphasis in original).]
We further held:
[T]he prosecution, in proving OUIL causing death, must establish beyond a reasonable doubt that (1) the defendant was operating his or her motor vehicle in violation of MCL 257.625(1), (3), or (8); (2) the defendant voluntarily decided to drive, knowing that he or she had consumed an intoxicating agent and might be intoxicated; and (3) the defendant’s operation of the motor vehicle caused the victim’s death. [Id. at 434, citing MCL 257.625(4).]
The Court of Appeals granted reconsideration in the Derror case in light of our decision in Schaefer, and held that the prosecution need only prove that Derror’s driving, not her intoxication, was the proximate cause of the accident.[12] The Court of Appeals further held that Schaefer applied to both MCL 257.625(4) and (5), although Schaefer analyzed subsection 4 only.[13]
We agree with the Court of Appeals application of Schaefer in this case to hold that the prosecution need only prove that Derror’s driving, not her intoxication, was the proximate cause of the accident. MCL 257.625(8) does not require intoxication or impairment — it simply requires that a person have *334 “any amount” of a schedule 1 controlled substance in his or her body while driving. We further agree that Schaefer’s holding applies to subsections 4 and 5 alike. The Court of Appeals stated, and we agree, that no reason exists to interpret the identical language of MCL 257.625(5) differently from MCL 257.625(4). We take this opportunity, however, to modify Schaefer to the extent that its holding is inconsistent with the plain language of MCL 257.625(4), (5), and (8).
MCL 257.625(4) and (5) punish for the operation of a motor vehicle causing death or serious impairment of a body function in violation of subsections 1,3, and 8. Here, Derror operated a motor vehicle causing death and serious impairment of body function in violation of subsection 8. Schaefer would seem to require the prosecution to prove that Derror voluntarily decided to drive, knowing that she had consumed an intoxicating agent and might be intoxicated. The plain language of MCL 257.625(8) does not require the prosecution to prove beyond a reasonable doubt that a defendant knew he or she might be intoxicated. MCL 257.625(8) does not require intoxication, impairment, or knowledge that one might be intoxicated; it simply requires that the person have “any amount” of a schedule 1 controlled substance in his or her body when operating a motor vehicle. We thus clarify Schaefer and hold that, in prosecutions involving violations of subsection 8, the prosecution is not required to prove beyond a reasonable doubt that a defendant knew he or she might be intoxicated. Because subsections 1 and 3 are not at issue in this case, we do not disturb our holding in Schaefer with regard to these subsections.
V RESPONSE TO THE DISSENT
The dissent claims that the majority’s interpretation of MCL 257.625(8) is unconstitutional because it: (1) *335 fails to provide notice about what conduct is prohibited, (2) is vague and provides potential for arbitrary and discriminatory enforcement, and (3) is not rationally related to the objective of the statute.
First, the only constitutional issue raised by defendant in his Statement of Questions was that the “expansion” of the definition of “marijuana” rendered the statute unconstitutionally vague and overbroad. Neither party raised the first and third constitutional concerns posed by the dissent. That the justices inquired at oral argument regarding the Legislature’s power to enact the statute in question does not preserve these constitutional issues as the dissent suggests. In his dissent in Mack v Detroit, 467 Mich 186; 649 NW2d 47 (2002), Justice CAVANAGH strongly criticized the practice of raising issues that have never been argued or properly briefed by the parties. He stated:
In reaching its holding, the majority disregards the foundational principles of our adversarial system of adjudication. As protectors of justice, we refrain from deciding issues without giving each party a full and fair opportunity to be heard. But not for this concern, the judicially created doctrine of standing would be discarded, as it ensures “concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination ....” However, the majority has disregarded such considerations, misconstruing the proper scope of its authority, by making dispositive an issue never argued or briefed by the parties. Neither of the parties has had the benefit of sharing with this Court their thoughts on the effect of the tort immunity act on this case, though the implications of the majority’s holding are vast. Never before have I witnessed such overreaching conduct from members of this Court. [Id. at 213 (CAVANAGH, J., dissenting) (citation omitted).]
Nevertheless, we will address these unpreserved constitutional issues. First, the dissent claims that our *336 interpretation of the statute does not provide an ordinary person with notice of prohibited conduct. To the contrary, the plain language of the statute is clear and unambiguous. MCL 257.625(8) prohibits the operation of a motor vehicle with any amount of a schedule 1 controlled substance in the body. In essence, the statute prohibits a person from driving after smoking marijuana. It is irrelevant that an “ordinary” marijuana smoker allegedly does not know that 11-carboxy-THC could last in his or her body for weeks. It is also irrelevant that a person might not be able to drive long after any possible impairment from ingesting marijuana has worn off. The use of marijuana is classified as a misdemeanor under current law, MCL 333.7404(1) and (2)(d). The Legislature’s prohibition of the operation of a motor vehicle with any amount of marijuana, which explicitly includes derivatives of marijuana, in the body provides more than adequate notice regarding the prohibited conduct. The corollary of this prohibition is that once the schedule 1 substance is no longer in the body, one can resume driving. It is irrelevant that the “ordinary person” cannot determine, without drug testing, when the schedule 1 substance is no longer detectible in the body.
The dissent next argues that our interpretation of the statute is unconstitutionally vague because it provides the potential for arbitrary and discriminatory enforcement. Specifically, it claims that our interpretation of the statute makes criminals of persons who have merely inhaled marijuana or people who are no longer under the influence of marijuana.
As previously stated, MCL 257.625(8) does not require that a person be under the influence of a schedule 1 controlled substance to violate the statute. It merely requires that a person have any amount of a schedule 1 *337 controlled substance in the person’s body. It is irrelevant that a person who is no longer “under the influence” of marijuana could be prosecuted under the statute. If the Legislature had intended to prosecute only people who were under the influence while driving, it could have written the statute accordingly.[14]
Moreover, if the general class of offenses to which the statute is directed is plainly within its terms, the statute will not be struck down as vague, even though doubtful cases could be hypothesized. See United States v Petrillo, 332 US 1, 5-8; 67 S Ct 1538; 91 L Ed 1877 (1947). In Petrillo, the United States Supreme Court stated:
The Constitution has erected procedural safeguards to protect against conviction for crime except for violation, of laws which have clearly defined conduct thereafter to be punished; but the Constitution does not require impossible standards. The language here challenged conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. The Constitution requires no more. [Id. at 7-8.]
In this case, both defendants admitted smoking marijuana just hours before driving. No question exists that that statute proscribes their conduct. Moreover, the statute sufficiently conveyed that operating a vehicle after smoking marijuana is illegal. Because a hypothetical case could be posed where doubts might arise does not render the statute unconstitutionally vague. The statute, as applied to these defendants, is constitutional.
*338 Finally, the dissent contends that our plain language interpretation of the statute does not pass muster under the rational basis test. Initially, we agree that rational basis review is appropriate because the statute is social legislation[15] enacted under the state’s traditional police power to regulate public safety, public health, morality, and law and order.[16] Further, under this highly deferential standard of review, the legislation must be upheld unless the challenger can show that it is “ ‘ “arbitrary, and wholly unrelated in a rational way to the objective of the statute.” ’ ”[17] We reject the dissent’s assertion that the statute is not rationally related to its objective.
The dissent claims that the statute’s objective is to prevent people from driving under the influence of a controlled substance. Not so. The statute’s stated objective is to prevent persons from driving with any amount of a schedule 1 controlled substance in the body, whether or not the substance is still influencing them. This is clearly a legitimate exercise of the Legislature’s police power since 11-carboxy-THC is indisputably only present in the body after someone has ingested marijuana, i.e., done something illegal.
Nevertheless, assuming that the statute’s objective is to prevent persons from driving under the influence of marijuana, the statute passes constitutional muster. *339 While the dissent seemingly concedes that preventing people from driving under the influence of marijuana is a legitimate government objective, it asserts that, under our interpretation, the statute is not rationally related to that objective because 11-carboxy-THC has no pharmacological effect and, therefore, cannot influence the person’s driving. That the statute might apply to some persons who are not actually under “the influence” of marijuana does not render the statute unconstitutional. Rather, under the rational basis standard of review, our only inquiry is whether any conceivable set of facts, either known or that can reasonably be assumed, even if they are debatable, might support the Legislature’s judgment that making it a crime for persons to drive with any amount of 11-carboxy-THC in the body will prevent them from driving under the influence of a controlled substance.[18]
Such a conceivable set of facts certainly exists in this case. It is undisputed that the presence of 11-carboxy-THC conclusively proves that a person, at some point, ingested THC, which is an ingredient in marijuana and which does have a pharmacological effect on the body. It is also undisputed that THC itself begins to break down and leave the bloodstream shortly after entering the body, but that its effects can last long after it is no longer detectible in the blood. It is thus conceivable that the Legislature enacted this statute to further the objective of preventing persons from driving under the influence of marijuana by enabling the prosecution of persons who might be under the influence of THC, but for whom only traces of 11-carboxy-THC, and not THC itself, are still present in the body.
*340 Moreover, under the rational basis test, we do not consider the wisdom of the Legislature’s choice, or whether that choice was made with mathematical nicety, or whether it is most narrowly drawn to obtain its objective, or whether it may be inequitable when put into practice.[19] In short, we do not consider the effects of the statute or its consequences, only its purpose.[20] As long as the Legislature’s objective is legitimate, the means that it chooses to obtain that objective is not rendered unconstitutional merely because it may be overinclusive.
In New York City Transit Auth v Beazer, 440 US 568; 99 S Ct 1355; 59 L Ed 2d 587 (1979), the United States Supreme Court upheld a statute applying the rational basis standard. The Beazer case involved a challenge to the New York City Transit Authority’s refusal to employ persons who used methadone, a drug used to cure heroin addiction, under a general safety-oriented policy against employing persons who use narcotic drugs. Id. at 570-573. The plaintiffs, participants in state-regulated methadone treatment programs who had been denied employment with the transit authority, challenged the blanket exclusion as overinclusive. Specifically, they asserted that the exclusion, at least as applied to them, did not further the policy’s goal of safety because methadone administered in such treatment programs does not produce euphoria, is an effective cure for heroin addiction, and frees the majority of persons involved in such programs from illicit drug use. Id. at 573-577.
*341 The Court rejected the plaintiffs’ challenge. After concluding that the transit authority’s blanket exclusion was probably broader than necessary to achieve its goal of ensuring safety, id. at 592, the Court stated that “it is of no constitutional significance that the degree of rationality is not as great with respect to certain ill-defined subparts of the classification as it is with respect to the classification as a whole.” Id. at 593. The same is true here. The goal of the legislation is legitimate. That the Legislature could have conceivably enacted a more perfectly precise statute does not render the current statute constitutionally invalid.[21]
VI. CONCLUSION
We hold that 11-carboxy-THC is a schedule 1 controlled substance under MCL 333.7212(l)(c) of the Public Health Code for the purpose of construing MCL 257.625(8) of the Michigan Vehicle Code. Accordingly, we reverse the judgment of the Court of Appeals regarding this issue, and remand both cases to the trial courts for further proceedings consistent with this opinion. We do not retain jurisdiction.
We reaffirm our holding in Schaefer that the prosecution need only prove that a defendant’s driving, not his or her intoxication, was a proximate cause of the accident. Further, Schaefer’s holding applies to both MCL 257.625(4) and (5). Accordingly, we affirm the judgment of the Court of Appeals regarding this issue in Docket No. 129269.
*342 We also modify Schaefer to hold that, in a prosecution involving MCL 257.625(8), the prosecutor need not prove beyond a reasonable doubt that the defendant knew he or she might be intoxicated.
Taylor, C.J., and YOUNG and Markman, JJ., concurred with Corrigan, J.

 People v Derror (On Reconsideration), 268 Mich App 67; 706 NW2d 451 (2005).

 Id.

 474 Mich 886 (2005); 474 Mich 887 (2005).

 <http://www.stedmans.com/section.cftn/45> (accessed March 8, 2006).

 <http://www.stedmans.com/section.cftn/45> (accessed March 8, 2006).

 <http://www2.merriam-webster.com/cgi-bin/mwmednlm> (accessed March 8, 2006).

 The dissent criticizes our choice of the definition of derivative that most closely effectuates the intent of the Legislature, claiming that because more than one definition exists, the term is ambiguous. Contrary to the dissent’s contention, however, a word is not ambiguous merely because different dictionary definitions exist. Twichel v MIC Gen Ins Corp, 469 Mich 524, 535 n 6; 676 NW2d 616 (2004), citing Koontz v Ameritech Services, Inc, 466 Mich 304, 317-318; 645 NW2d 34 (2002). Moreover, in Stanton, Justice Cavanagh used the very principles we use today to define “motor vehicle,” a term in which varying dictionary definitions existed. He stated:
It is possible to find varying dictionary definitions of the term “motor vehicle.” For example, the Random House Webster’s College Dictionary (2001) defines a “motor vehicle” as “an automobile, truck, bus, or similar motor-driven conveyance,” a definition that does not include a forklift. In our view, this definition appropriately reflects the commonly understood meaning of the term. The American Heritage Dictionary (2d College ed), on the other hand, defines “motor vehicle” as “self-propelled, wheeled conveyance that does not run on rails,” a definition, which would arguably include a forklift. Given these divergent definitions, we must choose one that most closely effectuates the Legislature’s intent. Fortunately, our jurisprudence under the governmental tort liability act provides an answer regarding which definition should be selected. As previously noted, it is a basic principle of our state’s jurisprudence that the immunity conferred upon governmental agencies and subdivisions is to be construed broadly and that the statutory exceptions are to be narrowly construed. Thus, this Court must apply a narrow definition to the undefined term “motor vehicle.” [Stanton, supra at 617-618 (citation omitted).]
*329 In choosing which definition of the term “derivative” is most appropriate here, we do not use our own “personal beliefs,” as suggested by the dissent. Rather, we use the plain language of the statute to divine the Legislature’s intent.

 The dissent contends that we conclude that 11-carboxy-THC is a derivative of THC because both substances look similar in structure. It further contends that we reach our conclusion by relying on an area of science in which experts do not even agree instead of relying on the plain language of the statute. To the contrary, we conclude that 11-carboxy-THC is a derivative of THC because it is related structurally to THC and is derivable from THC. See Merriam-Webster’s Online Medical Dictionary. We do not rely on expert testimony in reaching our conclusion. Rather, we rely on the plain language of the statutes in question. Specifically, we rely on MCL 333.7212(l)(c), which lists marijuana as a schedule 1 controlled substance, and MCL 333.7106(3), which defines “marijuana” as including derivatives of the plant. Also, contrary to the dissent’s suggestion, although the experts do not agree on all issues in this case, the experts do not dispute that 11-carboxy-THC and THC are nearly identical in structure and that 11-carboxy-THC is derived from the breakdown of THC.

 The dissent relies on MCL 333.7211 in concluding that schedule 1 controlled substances must have a pharmacological effect on the human body. It states:
The administrator shall place a substance in schedule 1 if it finds that the substance has high potential for abuse and has no accepted medical use in treatment in the United States or lacks accepted safety for use in treatment under medical supervision. [MCL 333.7211.]
This statute, however, is silent with regard to the pharmacological effects of a substance. Rather, it mandates the placement of a substance in schedule 1 if the substance has a high potential for abuse. It does not prohibit the inclusion of other substances in schedule 1. In any event, we note that marijuana has been expressly listed as a schedule 1 controlled substance. Because 11-carboxy-THC is included within the definition of “marijuana” as a derivative, it too constitutes a schedule 1 controlled substance.

 The dissent contends that our construction of Michigan’s definition of “marijuana” as including 11-carboxy-THC is contrary to and inconsistent with years of federal law. We first note that no federal court has specifically excluded 11-carboxy-THC from the definition of “marijuana.” Moreover, the dissent itself points out that the federal courts that have dealt with similar issues have reached their conclusions by interpreting the legislative history, rather than the plain language of the analogous federal statute. We are not bound by federal precedent in interpreting state law, Continental Motors Corp v Muskegon Twp, 365 Mich 191, 194; 112 NW2d 429 (1961), and we decline to adopt the federal precedents the dissent cites when they do not comport with the actual words that our Legislature used to convey its meaning.
Additionally, the Legislature has directed that the statute should not only be construed consistently with applicable federal law, but also *331 “liberally construed for the protection of the health, safety, and welfare of the people of this state.” MCL 333.1111(2). The definition employed by the majority meets both directives.

 See, for example, MCL 257.624a, in which the Legislature has made it illegal for a driver or passenger of a motor vehicle to transport or possess alcoholic liquor in an open container, regardless of whether the persons in the car actually drink the alcoholic beverage.

 268 Mich App 82.

 Id. at 81.

 The Legislature has included an “under the influence” requirement in other sections of MCL 257.625. See subsections 1 to 3. Thus, if the Legislature had also intended to include the same requirement in subsection 8, it would have done so.

 See Phillips v Mirac, Inc, 470 Mich 415, 434; 685 NW2d 174 (2004).

 Berman v Parker, 348 US 26, 32; 75 S Ct 98; 99 L Ed 27 (1954) (“Public safety, public health, morality, peace and quiet, law and order— these are some of the more conspicuous examples of the traditional application of the police power to municipal affairs. Yet they merely illustrate the scope of the power and do not delimit it.”).

 Phillips, supra at 433, quoting Crego v Coleman, 463 Mich 248, 259; 615 NW2d 218 (2000), quoting Smith v Employment Security Comm, 410 Mich 231, 271; 301 NW2d 285 (1981); see also Harvey v Michigan, 469 Mich 1, 7; 664 NW2d 767 (2003).

 Muskegon Area Rental Ass’n v Muskegon, 465 Mich 456, 464; 636 NW2d 751 (2001); Harvey, supra at 7.

 Phillips, supra at 434; Muskegon Area Rental, supra at 464; Harvey, supra at 7.

 Phillips, supra at 435, quoting Duke Power Co v Carolina Environmental Study Group, 438 US 59, 83-84; 98 S Ct 2620; 57 L Ed 2d 595 (1978).

 Contrary to the dissent’s contention, we are not “ignor[ing] [our] mandate to reasonably construe a statute to ensure that it is constitutional ....” Post at 355 n 5. Our construction of the statute, which is consistent with the plain language of the statute, does not render the statute unconstitutional. Thus, we need not construe the statute differently.