MARKMAN, J.
(dissenting). I respectfully dissent from the majority’s decision to overrule Kreiner v Fischer, 471 Mich 109; 683 NW2d 611 (2004). The no-fault automobile insurance act, in MCL 500.3135(1), provides that “[a] person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement.” The issue here is whether plaintiff has suffered a serious impairment of body function. “ ‘[Sjerious im *227 pairment of body function’ means an objectively manifested impairment of an important body function that affects the person’s general ability to lead his or her normal life.” MCL 500.3135(7).
In Kreiner, 471 Mich at 132-133, this Court held that in determining whether an impairment affects the plaintiffs general ability to lead his normal life, “a court should engage in a multifaceted inquiry, comparing the plaintiffs life before and after the accident as well as the significance of any affected aspects on the course of the plaintiffs overall life.” In addition, Kreiner indicated that certain factors, such as the duration of the impairment, may be of assistance in evaluating whether the plaintiffs general ability to lead his normal life has been affected. Id. at 133.
The majority overrules Kreiner, rejecting these factors and holding that temporal considerations are wholly or largely irrelevant in determining whether an impairment affects the plaintiffs general ability to lead his normal life. The majority instead holds that, as long as the plaintiffs general ability to lead his normal life has been affected, apparently for even a single moment in time, the plaintiff has suffered a “serious impairment of body function.” This conclusion is at odds with the actual language of the no-fault automobile act and nullifies the legislative compromise embodied in that act. I continue to believe that Kreiner was correctly decided, and that temporal considerations are highly relevant — indeed necessary — in determining whether an impairment affects the plaintiffs general ability to lead his normal life. By nullifying the legislative compromise, which was grounded in concerns over excessive litigation, the over-compensation of minor injuries, and the availability of affordable insurance, the Court’s decision today will resurrect a legal environment in which each of these hazards reappears and threatens the continued fiscal integrity of our no-fault system.
*228 Because I do not believe that the lower courts erred in concluding that plaintiff in this case has not suffered a serious impairment of body function, I would affirm the judgment of the Court of Appeals.
I. FACTS AND HISTORY
Because the majority opinion provides only a cursory presentation of the facts, in a case requiring a fact-intensive analysis, I find it necessary to set forth a more thorough discussion of these facts. Beginning in August 2002, plaintiff was employed by Allied Systems, and over the years, he has held various positions with the company.[1] On January 17, 2005, approximately six months after beginning his position as a medium-duty truck loader, plaintiff was struck by a truck driven by plaintiffs co-worker and co-defendant, Larry Carrier, while shuttling vehicles at a General Motors plant. Plaintiff was knocked down, and the wheels of the truck ran over his left ankle, fracturing his medial malleolus. Plaintiff was immediately taken to the hospital and was released that same day. Two days later, he underwent surgery for the implantation of a device to stabilize his ankle fracture. Immediately following surgery, plaintiff was on crutches and in a boot for approximately four weeks and, during this time, he was restricted from bearing weight on his left leg. Additionally, plaintiff underwent physical therapy.[2]
*229 On October 21,2005, plaintiff again underwent surgery on his ankle, this time to remove the implanted device. The surgeon reported that plaintiffs ankle had “healed nicely.” On November 5, 2005, at the request of Allied, plaintiff was examined by Dr. Paul Drouillard, who stated that plaintiff could return to work with restrictions of no prolonged standing or walking for three weeks, after which time plaintiff could return to work with no restrictions. On November 17, 2005, plaintiff was examined by his surgeon, who observed that plaintiffs “wound is healed veiy nicely” and that plaintiff “needs to be in seated work for approximately six weeks.”
On January 12, 2006, plaintiffs surgeon examined him and cleared him to return to work with no restrictions. At this examination, plaintiff reported to his surgeon that “[h]is medial malleolus is not giving him any pain.” The surgeon observed that plaintiff had an “excellent range of motion with no specific tenderness.” Upon returning to work for several days, however, plaintiff indicated that performing the physical tasks that his job required, such as walking, climbing, and crouching, caused his ankle to hurt. After plaintiffs request for a different assignment was denied, plaintiff went back on workers’ compensation.
On March 16, 2006, Allied required plaintiff to undergo a functional capacity evaluation (FCE),[3] which showed that plaintiff could not fully perform all of his *230 previous job duties.[4] During this evaluation, when asked what his goal was in returning to work, plaintiff responded, “I don’t want to go back to work; there is talk about a buyout and I think I want to do that.” Plaintiff also reported that his ankle pain was 3 on a scale of zero to 10, with 10 being the highest.
On May 31, 2006, Dr. Drouillard again examined plaintiff, at the request of Allied. Dr. Drouillard found no objective abnormality to correspond to plaintiffs complaints and opined that plaintiff was magnifying his symptoms. Dr. Drouillard also observed that, although plaintiff claimed that he had been wearing an ankle brace for the last two weeks, the tan lines on plaintiffs left and right feet were symmetrical, consistent with wearing flip-flops, with no break in his tan lines to indicate that he had been wearing the brace at all. Dr. Drouillard believed that plaintiff could return to work unrestricted and that plaintiffs ankle required no further treatment.
On June 12, 2006, plaintiff underwent an MRI test; the physiatrist who reviewed the MRI and performed a follow-up examination found that there was some evidence of ligamentous injury, but he did not establish a plan to decrease plaintiffs pain because there was little the physiatrist could do.[5] At this examination, plaintiff reported that his pain was 6 on a scale of zero to 10, that the pain was worse with “any movement,” and that nothing alleviated that pain. On June 20, 2006, Dr. Drouillard reviewed the MRI results and found that *231 plaintiffs ankle had healed well and that his opinion from May 31, 2006, had not changed.
Shortly thereafter, plaintiffs workers’ compensation benefits were terminated.[6] At this point, plaintiff sought another FCE so that he could return to work. On August 1, 2006, the FCE indicated that plaintiff was able to perform essential job demands without restriction. At this FCE, plaintiff reported that he experienced “occasional aching” in his ankle, and that there were no “activities that aggravated his symptoms in the left ankle (including prolonged standing, prolonged walking).” Plaintiff reported that his pain level was 2 on a scale of zero to 10 and, during the two weeks immediately preceding the FCE, his highest pain level had been 3 and his lowest pain level had been 1. By the completion of the FCE, plaintiff reported his pain level as zero. On August 16, 2006, approximately 17 months after the accident, plaintiff returned to work and Allied assigned him to a new job with different physical requirements, and with no reduction in pay. Plaintiff volunteered to be assigned to this other job, and has been able to perform his new job duties since that time.
During his recuperation, plaintiff did not require any assistance with normal household tasks. Additionally, he was able to drive and his injuries have not affected his relationship with his wife in any way.[7] Outside of work, plaintiff was able to engage in most of the *232 activities in which he had engaged before his injury, such as fishing.[8] Importantly, by plaintiff’s own admission at his deposition in October 2006, his life was “normal” despite some “occasional aching.”
On March 24, 2006, plaintiff filed a third-party action against Carrier (the driver of the truck) and General Motors Corporation (GM).[9] Carrier was later released by stipulation of the parties, and the trial court granted GM’s motion for summary disposition, finding that plaintiff had undergone a relatively good recovery and could not meet the “serious impairment of body function” threshold.
The Court of Appeals affirmed, with one judge dissenting, concluding that the impairment did not affect plaintiffs general ability to lead his normal life. McCormick v Carrier, unpublished opinion per curiam of the Court of Appeals, issued March 25, 2008 (Docket No. 275888). The majority cited various facts to support its *233 conclusion, such as plaintiffs golfing, fishing, driving, caring for himself, and returning to work without restriction. The dissent would have reversed for two reasons: first, on the basis that plaintiffs entire life, including the possibility of future problems, must be considered; and, second, on the basis that there was evidence to indicate that plaintiffs life was not currently normal. The evidence that the dissent relied on to reach this conclusion was that plaintiff was assigned to a job with reduced physical requirements and the doctors had identified “some indication of degenerative joint disease in [plaintiffs] ankle.” Id., unpub op at 2 (DAVIS, J., dissenting).
On October 22, 2008, this Court denied plaintiffs application for leave to appeal, although Chief Justice KELLY and Justices Cavanagh and WEAVER would have granted leave to appeal. 482 Mich 1018 (2008). However, after the composition of this Court changed when Justice HATHAWAY replaced former Chief Justice TAYLOR on January 1, 2009, this Court granted plaintiffs motion for reconsideration, even though such motion had not raised any new legal arguments. 485 Mich 851 (2009).
II. STANDARD OF REVIEW
This case presents issues of statutory interpretation, which this Court reviews de novo. Dep’t of Transp v Tompkins, 481 Mich 184, 190; 749 NW2d 716 (2008). We also review rulings on motions for summary disposition de novo. Spiek v Dep’t of Transp, 456 Mich 331, 337; 572 NW2d 201 (1998).
III. ANALYSIS
A. HISTORY OF NO-FAULT INSURANCE ACT
In Michigan, before the enactment of the no-fault insurance act, the only available recourse to victims of *234 motor vehicle accidents seeking to recover damages was to file a common-law tort action. “[U]nder [this] tort liability system[,] the doctrine of contributory negligence denied benefits to a high percentage of motor vehicle accident victims, minor injuries were overcompensated, serious injuries were undercompensated, long payment delays were commonplace, the court system was overburdened, and those with low income and little education suffered discrimination.” Shavers v Attorney General, 402 Mich 554, 579; 267 NW2d 72 (1978). In response to these deficiencies, the Legislature enacted the no-fault automobile insurance act, MCL 500.3101 et seq., effective March 30, 1973. The primary goal of the no-fault act is “to provide victims of motor vehicle accidents assured, adequate, and prompt reparation for certain economic losses.” Shavers, 402 Mich at 579. In order to meet this objective, the Legislature decided to make no-fault insurance compulsory, i.e., “whereby every Michigan motorist would be required to purchase no-fault insurance or be unable to operate a motor vehicle legally in this state.” Id. In addition, “[i]n exchange for the payment of. . . no-fault economic loss benefits from one’s own insurance company, the Legislature limited an injured person’s ability to sue a negligent operator or owner of a motor vehicle for bodily injuries.” Kreiner, 471 Mich at 115. That is, with the enactment of the no-fault act, “the Legislature abolished tort liability generally in motor vehicle accident cases and replaced it with a regime that established that a person injured in such an accident is entitled to certain economic compensation from his own insurance company regardless of fault.” Id. at 114.[10] In *235 exchange for economic loss benefits regardless of fault, “the Legislature significantly limited the injured person’s ability to sue a third party for noneconomic damages, e.g., pain and suffering.” Id. at 115. More specifically, no tort suit against a third party for non-economic damages is permitted unless the injured person “has suffered death, serious impairment of body function, or permanent serious disfigurement.” MCL 500.3135a). [11]
The Legislature did not initially define the language that is in dispute in this case — “serious impairment of body function” — and this Court itself struggled in the process of giving reasonable meaning to this language. In Advisory Opinion re Constitutionality of 1972 PA 294, 389 Mich 441, 481; 208 NW2d 469 (1973), we held that whether the plaintiff has suffered a “serious impairment of body function” is “within the province of the trier of fact. . . .” However, in Cassidy v McGovern, 415 Mich 483; 330 NW2d 22 (1982), noting that an advisory opinion “ ‘is not precedential^ binding in the same sense as a decision of the Court after a hearing on the merits,’ ” id. at 495 (citation omitted), this Court held:
*236 [W]hen there is no factual dispute regarding the nature and extent of a plaintiffs injuries, the question of serious impairment of body function shall be decided as a matter of law by the court. Likewise, if there is a factual dispute as to the nature and extent of a plaintiffs injuries, but the dispute is not material to the determination whether plaintiff has suffered a serious impairment of body function, the court shall rule as a matter of law whether the threshold requirement... has been met. [Id. at 502.]
In addition, Cassidy held that the phrase “serious impairment of body function” refers to “objectively manifested injuries” that impair “important body functions.” Id. at 504-505. Cassidy also held that “the Legislature intended an objective standard that looks to the effect of an injury on the person’s general ability to live a normal life.” Id. at 505. Finally, Cassidy held that although “an injury need not be permanent to be serious,” “[p]ermanency is, nevertheless, relevant” because “[t]wo injuries identical except that one is permanent do differ in seriousness.” Id. at 505-506.
However, only four years later, in DiFranco v Pickard, 427 Mich 32; 398 NW2d 896 (1986), this Court overruled Cassidy. DiFranco held that “[i]f reasonable minds can differ as to whether the plaintiff suffered a serious impairment of body function, the issue must be submitted to the juiy, even if the evidentiary facts are undisputed.” Id. at 58. In addition, DiFranco held that the “impairment need not be of... an important body function,” and it is unnecessary to look to the effect of the injury on the person’s “ ‘general ability to live a normal life.’ ” Id. at 39. DiFranco also held that, although the plaintiff must prove a “medically identifiable injury,” this can be done on the basis of “the plaintiffs subjective complaints or the symptoms of an injury.” Id. at 75. Finally, DiFranco held that the following factors should be considered when determining whether the impairment was serious:
*237 The extent of the impairment, the particular body function impaired, the length of time the impairment lasted, the treatment required to correct the impairment, and any other relevant factors. [Id. at 69-70.]
In 1995, the Legislature amended the no-fault act. In particular, it amended MCL 500.3135(2)(a), which provides:
The issues of whether an injured person has suffered serious impairment of body function or permanent serious disfigurement are questions of law for the court if the court finds either of the following:
(i) There is no factual dispute concerning the nature and extent of the person’s injuries.
(ii) There is a factual dispute concerning the nature and extent of the person’s injuries, but the dispute is not material to the determination as to whether the person has suffered a serious impairment of body function or permanent serious disfigurement.
In addition, the Legislature defined “serious impairment of body function” to mean “an objectively manifested impairment of an important body function that affects the person’s general ability to lead his or her normal life.” MCL 500.3135(7). In other words, the Legislature essentially rejected DiFranco and, with one exception, codified Cassidy.[12]
B. KREINER v FISCHER
In Kreiner, this Court for the first time interpreted the Legislature’s definition of “serious impairment of *238 body function.” Because “generally” means “ ‘for the most part,’ ” Kreiner held that “determining whether a plaintiff is ‘generally able’ to lead his normal life requires considering whether the plaintiff is, ‘for the most part’ able to lead his normal life.” Kreiner, 471 Mich at 130, quoting Random House Webster’s College Dictionary (1991). In addition, because “lead” means “ ‘to conduct or bring in a particular course,’ ” Kreiner held that “the effect of the impairment on the course of a plaintiffs entire normal life must be considered.” Id. at 130-131, quoting Random House Webster’s Unabridged Dictionary (2001). Therefore, Kreiner concluded,
[ajlthough some aspects of a plaintiffs entire normal life may be interrupted by the impairment, if, despite those impingements, the course or trajectory of the plaintiffs normal life has not been affected, then the plaintiffs “general ability” to lead his normal life has not been affected and he does not meet the “serious impairment of body function” threshold.” [Id. at 131.]
Kreiner established a “multi-step process... for separating out those plaintiffs who meet the statutory threshold from those who do not.” Id. First, the court must determine whether there is a factual dispute that is material to the determination whether the person has suffered a serious impairment of body function.[13] Second, the court must determine whether an important body function has been impaired. Third, the court must determine whether the impairment is objectively manifested.[14] Finally, the court must determine whether the *239 impairment affects the plaintiffs general ability to lead his or her normal life. “In determining whether the course of the plaintiffs normal life has been affected, a court should engage in a multifaceted inquiry, comparing the plaintiffs life before and after the accident as well as the significance of any affected aspects on the course of the plaintiffs overall life.” Id. at 132-133. Kreiner indicated that the following factors may be of assistance in evaluating whether the plaintiffs general ability to conduct the course of his normal life has been affected:
(a) the nature and extent of the impairment, (b) the type and length of treatment required, (c) the duration of the impairment,[15](d) the extent of any residual impairment/[16] and (e) the prognosis for eventual recovery. \Id. at 133.]
Although the dissent in Kreiner essentially agreed with the majority’s analysis of the language “an objectively manifested impairment of an important body function,” it disagreed with the majority’s analysis of the language “that affects the person’s general ability to lead his or her normal life.” Most significantly in this regard, the dissent rejected the factors set forth by the majority on the basis that “time or temporal considerations” are inappropriate considerations. Id. at 147 (CAVANAGH, J., dissenting).
C. MAJORITY’S NEW TEST
It is appropriate that Justice CAVANAGH, the authoring justice of the majority opinion in DiFranco, which *240 was rejected by the Legislature, and also the authoring justice of the dissent in Kreiner, which was rejected by this Court, is now the authoring justice of the majority opinion, in which Kreiner is overruled. While to some there may be a sense of justice, or at least a sense of irony, in this sequence of events, to others, including those of us in dissent in this case, such sequence embodies all that is wrong when a judiciary confuses its own preferences with those of the people’s representatives in the Legislature. While it is intriguing that Justice CAVANAGH now is able to transform his dissent in Kreiner into a majority opinion, and thereby resuscitate his earlier opinion in DiFranco, this has been achieved only after the people of this state, through their Legislature, have made clear that DiFranco did not reflect what ought to be the policy of this state. Therefore, just as he did in his dissent in Kreiner, Justice CAVANAGH, now with majority support, rejects Kreiner’s analysis of the language “that affects the person’s general ability to lead his or her normal life.” The worm has turned, and never mind what the people and their Legislature have sought to accomplish in establishing as the law.
Before proceeding too far into where our substantive disagreements lie, I would be remiss not to point out where we are in agreement. First, the majority, just as did the Kreiner dissent, largely agrees with Kreiner’s analysis of MCL 500.3135(2)(a), i.e., if there is no material factual dispute, whether a person has suffered a serious impairment of body function should be determined by the court as a matter of law.[17] The majority *241 also largely agrees with Kreiner’s analysis of the language “an objectively manifested impairment of an important body function.”[18] In addition, the majority *242 agrees with Kreiner’s conclusion that the serious impairment of body function threshold entails a subjective analysis, i.e., “[wjhether an impairment that precludes a person from throwing a ninety-five miles-an-hour fastball is a ‘serious impairment of body function’ may depend on whether the person is a professional baseball player or an accountant who likes to play catch with his son every once in a while.” Kreiner, 471 Mich at 134 n 19. The majority also agrees with Kreiner’s conclusion that determining whether a plaintiffs general ability to lead his or her normal life has been affected “necessarily requires a comparison of the plaintiffs life before and after the incident.”[19] Finally, the majority agrees with Kreiner’s conclusion that permanency is not required.[20]
1. DiFRANCO VERSUS CASSIDY
However, this is where our agreements end. First, the majority takes issue with Kreiner’s statement that “the Legislature largely rejected DiFranco in favor of Cassidy.” Kreiner, 471 Mich at 121 n 8. As explained earlier, the Legislature adopted Cassidy with a single exception. That single exception pertains to the fact that Cassidy, 415 Mich at 505, required an evaluation of “the effect of an injury on *243 the person’s general ability to live a normal life,” while MCL 500.3135(7) requires an evaluation of the effect of an injury on “the person’s general ability to lead his or her normal life.” (Emphasis added.) That is, while the Cassidy test was entirely objective, the MCL 500.3135(7) test is at least partially subjective. As this Court explained in Kreiner, 471 Mich at 121 n 7:
[T]he Legislature modified the entirely objective Cassidy standard to a partially objective and partially subjective inquiry. Thus, what is “normal” is to be determined subjectively on the basis of the plaintiffs own life and not the life of some objective third party. However, once that is fixed as the base, it is to be objectively determined whether the impairment in fact affects the plaintiffs “general ability to lead” that life.
Nevertheless, given that: (a) Cassidy, 415 Mich at 505, held that courts should “look[] to the effect of an injury on the person’s general ability to live a normal life”; (b) DiFranco, 427 Mich at 39, held that courts should not look to the effect of the injury on the person’s “ ‘general ability to live a normal life’ ”; and (c) the Legislature subsequently and affirmatively directed the courts to look to the effect of an injury on “the person’s general ability to lead his or her normal life,” MCL 500.3135(7), the Legislature obviously preferred the policy of Cassidy to that of DiFranco. In addition, in contrast to DiFranco, and consistent with Cassidy, the Legislature expressly adopted an “important body function” requirement, MCL 500.3135(7), and amended MCL 500.3135 to make clear that whether a serious impairment of body function has occurred is a question of law unless there is a material factual dispute. MCL 500.3135(2)(a). Thus, contrary to the majority’s understandably defensive posture, it is hardly an “oversim *244 plification” to conclude that the Legislature essentially rejected DiFranco in favor of Cassidy.[21]
Moreover, the Legislature’s action of amending MCL 500.3135 following DiFranco is an example of legislative history that has genuine utility in the interpretative process. This Court has emphasized that “not all legislative history is of equal value,” and has specifically noted that “[cjlearly of the highest quality is legislative history that relates to an action of the Legislature from which a court may draw reasonable inferences about the Legislature’s intent. . . .” In re Certified Question, 468 Mich 109, 115 n 5; 659 NW2d 597 (2003). The instant case presents an ideal “[e]xample[] of legitimate legislative history,” i.e., the recitation of “actions of the Legislature intended to repudiate the judicial construction of a statute....” Id. And yet, not altogether inexplicably, the majority entirely disregards these legislative actions.
Defendant and the Attorney General as amicus curiae have presented the Court with legislative analyses, committee reports, and other materials to support their argument that, in enacting the amendments, the Legislature intended to repudiate DiFranco and restore Cassidy, just as Kreiner held. Even the most cursory review of these documents demonstrates that defendant and the Attorney General’s reading has merit. For example, the original draft of House Bill 4341 was accompanied by a memorandum from its sponsor that stated that the bill’s first goal was to “[reestablish the two-part Cassidy standard of: (1) definition of ‘serious impairment of body function,’ and (2) make the determination of whether an injury is a serious impairment *245 of body function a question of law (judge) rather than of fact (jury).” Memorandum of Representative Harold J. Voorhees, enclosing the original draft of HB 4341 as introduced, February 8, 1995, available in defendant’s appendix on appeal, p 8b. Similarly, the House legislative analysis expressly set forth the chronology of Cassidy and DiFranco, noting that DiFranco had “rejected” Cassidy and that the bill “would return to a tort threshold resembling that provided by the Cassidy ruling....” House Legislative Analysis, HB 4341, December 18, 1995. The analysis provided to the Senate Financial Services Committee likewise explained in the first sentence of the bill’s description that it “would put into law the Cassidy standards for meeting the serious impairment of body function threshold.” Department of Commerce Bill Analysis of HB 4341, February 14,1995. And finally, it is apparent from the statements of protest of the bill’s opponents that they also clearly understood House Bill 4341 to be a “return to the Cassidy standard . . ..” Statement of Senator Henry E. Stallings II, 1995 Journal of the Senate 1784 (October 12,1995); see also statement of Senator John D. Cherry, Jr., id. at 1785.
While on several occasions I have explained why I do not find all forms of legislative history to be useful tools in the interpretative process, see, e.g., Petersen v Magna Corp, 484 Mich 300, 381-382; 773 NW2d 564 (2009) (MARKMAN, J., dissenting), the author of the majority opinion has never questioned their utility.[22] Thus, there *246 is no apparent reason why the majority “turn[s] a blind eye to the wealth of extrinsic information available” on the history of the 1995 amendments. Nat'l Pride at Work, Inc v Governor, 481 Mich 56, 95 n 34; 748 NW2d 524 (2008) (KELLY, J., dissenting). Rather, the only, quite obvious explanation for the majority’s selective silence is that it can find nothing in this “wealth of extrinsic information available” to support its interpretation. One of the most common and compelling critiques of the use of legislative history is that a judge can almost always find something in the legislative history to support the interpretation he personally wishes to give to a law. To borrow an analogy invoked by United States Supreme Court Justice Antonin Scalia, using legislative history is like entering a room, looking over the assembled multitudes in the crowd, and picking out *247 your friends. See Scalia, A Matter of Interpretation (Princeton, NJ: Princeton University Press, 1997), p 36. In its near silence, the majority places a new twist on this analogy, and illustrates another fundamental problem with the use of legislative history. Here, the majority enters a room and, finding no friends in sight, makes a quick exit. Considering the quality and quantity of the legislative history available here, the majority’s “quick exit” and its selective silence on the subject speaks volumes. It should not go unremarked that it is this dissent that cites legislative history — albeit a uniquely persuasive and bona fide form of legislative history — as a relevant factor in interpreting MCL 500.3135, while the justices of the majority, the supposed advocates of this mode of interpretation, exclude this from their consideration. Apparently, legislative history is to be considered when it supports a justice’s preferred interpretation, and ignored when it does not.
Indeed, the problem with this approach of sometimes relying on legislative history and sometimes not is, as I explained in my dissent in Petersen, 484 Mich at 381-382, that
it is a process in which judges in the very guise of selecting the tools and factors to be employed in “interpreting” the law are effectively its formulators — in short, judges who are wielding the legislative, not the judicial, power.
A critical strength of a judicial philosophy committed to exercising only the constitution’s “judicial power” is that reasonably clear rules of decision-making are established before the fact. That is, a judge essentially promises the parties that he or she will decide their case, as with sill others, by attempting to discern the reasonable meaning of relevant statutes or contracts and that this will be done by relying upon recognized rules, and tools, of interpretation. By contrast, under the [majority’s] approach ..., in which there is essentially a limitless array of rules, and tools, that may be employed for “defining” the law apart from its *248 language, there is no consistently applied interpretative process with which the judge promises beforehand to comply. He or she may promise to be “fair,” and he or she may seek to be fair, but there are no rules for how this fairness is to be achieved. There is only the promise that the judge will address each dispute on a case-by-case basis, using whatever rules, and whichever tools, he or she believes are required in that instance. And the suspicion simply cannot be avoided that these varying and indeterminate rules, and tools, may be largely a function of the outcome preferred by the judge and by his or her personal attitudes toward the parties and their causes. Any interpretative rules will be identified only after the fact, and these “rules” may or may not have been invoked in resolving yesterday’s dispute, and may or may not be employed in resolving tomorrow’s dispute. Any judge can concoct an after-the-fact rationale for a decision; the judicial process, however, is predicated upon before-the-fact rationales. An ad hoc process is not a judicial process at all. In the place of predetermined rules — otherwise understood as the rule of law — the [majority] would substitute rules to be determined later. [Emphasis in the original.]
2. “TRAJECTORY” AND “ENTIRE”
Next, the majority peremptorily rejects Kreiner’s use of the words “trajectory” and “entire.” Again, the pertinent statutory language being defined here is, “that affects the person’s general ability to lead his or her normal life.” MCL 500.3135(7). “Lead” is defined as “to conduct or bring... in a particular course,” and, as the majority acknowledges, “ ‘trajectory’ is a synonym for ‘course’...” See Random House Webster’s College Dictionary (1991). In addition, contrary to the majority’s contention, Kreiner’s use of the word “entire” was not “created out of thin air ... .” Instead, the use of the word “entire” derived from the Legislature’s use of the word “general” because “in general” means “with respect to the entirety.” Random House Webster’s College *249 Dictionary (1991) (emphasis added). More accurately, it is the meaning that the majority gives to “general” that is “created out of thin air.” The majority concludes that the word “general” means “some,” even though the definition that the majority itself relies upon does not even include “some,” but instead indicates that “general” means “whole,” “every,” “majority,” “prevalent,” “usually,” “in most instances,” “not limited,” and “main features.” Nowhere among these possible meanings can a reader sight the word “some.”[23]
3. TEMPORAL CONSIDERATIONS
Finally, the majority rejects the non-exhaustive list of factors that Kreiner set forth for consideration in evaluating whether the plaintiffs general ability to lead his normal life has been affected. The majority asserts that Kreiner “departed . . . from the statutory text, by providing an extra-textual ‘nonexhaustive list of objective factors’ to be used to compare the plaintiffs pre- and post-incident lifestyle.” This critique is quite surprising given that it is not uncommon for courts in general, and for this Court in particular, to provide “extra-textual” factors to be considered in interpreting a statute that *250 demands a fact-specific analysis.[24] To the best of my knowledge, members of this majority have never before complained about this practice, but consistency in the application and non-application of interpretative factors is hardly a preoccupation of this majority.[25]
Indeed, in DiFranco itself, Justice CAVANAGH provided numerous “extra-textual” factors to be considered in determining whether a plaintiff has established a serious impairment of body function. DiFranco, 427 Mich at 69-70, states:
In determining whether the impairment of body function was serious, the jury should consider such factors as the extent of the impairment, the particular body function impaired, the length of time the impairment lasted, the treatment required to correct the impairment, and any other relevant factors.
Indeed, these “extra-textual” factors are remarkably similar to the Kreiner factors: “(a) the nature and extent of the impairment, (b) the type and length of treatment required, (c) the duration of the impairment, (d) the extent of any residual impairment, and (e) the prognosis for eventual recovery.” Kreiner, 471 Mich at *251 133. It not clear why the authoring justice thought it acceptable to list “extra-textual” factors in DiFranco, but unacceptable to cite virtually the same factors in Kreiner. In addition, in Wexford Med Group v City of Cadillac, 474 Mich 192; 713 NW2d 734 (2006), he listed “extra-textual” factors a court should consider in determining whether an entity is a “charitable institution” and thus exempt from ad valorem property taxes. Also, in Chmielewski v Xermac, Inc, 457 Mich 593, 633; 580 NW2d 817 (1998), the Court considered the Handicapper’s Civil Rights Act requirement that to be handicapped one must be “substantially limited in a major life activity.” MCL 37.1103(e)(i)(A). Then-Justice KELLY, joined by Justice CAVANAGH, stated in dissent:
I would hold that the following factors should be considered to determine whether an individual is substantially limited in a major life activity: (1) the nature of the impairment, (2) its severity, (3) its duration or expected duration, and (4) its long-term effect. [Chmielewski, 457 Mich at 633.]
See, also, Wood v Detroit Auto Inter-Ins Exch, 413 Mich 573; 321 NW2d 653 (1982), listing several “extra-textual” factors a court should consider in awarding “reasonable” attorney fees under MCL 500.3148(1);[26] Workman v Detroit Auto Inter-Ins Exch, 404 Mich 477, 496-497; 274 NW2d 373 (1979), adopting a four-factor test to determine whether for purposes of the no-fault act a person is “domiciled in the same household” as a relative pursuant to MCL 500.3114; Stewart v Michigan, 471 Mich 692, 698-699; 692 NW2d 376 (2004), stating that “extra-textual” “factors such as the manner, location, and fashion in which a vehicle is parked” *252 are material to determining whether the parked vehicle poses an unreasonable risk under MCL 500.3106(1); and Reed v Yackell, 473 Mich 520; 703 NW2d 1 (2005), utilizing an “extra-textual” multifactor economic-reality test to determine who is an employer for purposes of the Worker’s Disability Compensation Act.
As should be readily apparent, the majority’s claim that Kreiner erred by including “extra-textual” factors to consider in interpreting a statute is a wholly manufactured concern. The statute requires a fact-specific analysis. As Justice CAVANAGH’s DiFranco opinion and numerous other decisions of this Court have recognized, such factors assist courts in applying the statutory language on a case-by-case basis. To date, none of the members of the majority have objected to the inclusion of such factors in any other of this Court’s decisions.
Nevertheless, the majority rejects Kreiner’s “extra-textual” factors on the basis that they all “include a temporal component,” reiterating the argument made by the Kreiner dissent that “the statute does not create an express temporal requirement as to how long an impairment must last. . . .” Ante at 203, 208; see also Kreiner, 471 Mich at 147 (CAVANAGH, J., dissenting) (“[T]he serious impairment of body function threshold does not suggest any sort of temporal limitation. . . . Therefore, the duration of the impairment is not an appropriate inquiry.”). Indeed, the majority now holds that it is unnecessary to consider whether the impairment even “continues to affect [plaintiffs] general ability to lead his pre-incident ‘normal life’ . . . .” (Emphasis added.)
The majority, not surprisingly, claims that this dissent mischaracterizes its holding when we conclude that temporal considerations are wholly or largely irrel *253 evant in the majority’s holding. Not only, as explained above, is my characterization of their holding supported by the actual language of the majority opinion, but it is also dictated by simple logic. That is, given that the majority rejects Kreiner’s factors because they all “include a temporal component,” given that it feels passionately enough about this to write a lengthy opinion overruling Kreiner, and given that we can discern no other significant departure from Kreiner in the majority’s new test than that of the temporal component,[27] it is difficult to escape the conclusion we reach here, that the majority believes that temporal considerations are wholly or largely irrelevant.
I am reminded of a famous Sherlock Holmes line:
“How often have I said to you that when you have eliminated the impossible, whatever remains, however improbable, must be the truth?” [A. Conan Doyle, The Sign of the Four, from The Complete Sherlock Holmes (New York: Doubleday, 1890), ch 6, p 111.]
*254 That is, given that the majority essentially agrees with everything in Kreiner but its temporal considerations,[28] Kreiner’s temporal considerations are all that remain as to our disagreement. Therefore, that the majority disagrees with Kreiner’s temporal considerations, such as the duration of the impairment, “must be the truth.” In other words, when comparing the Kreiner test and the majority’s new test — whatever that is intended to be— the only apparent substantive difference is that, while Kreiner expressly includes temporal considerations, the majority’s test does not. Given that the majority essentially agrees with everything in Kreiner but its temporal considerations, and given that the only reason it gives for rejecting these considerations is that they all “include a temporal component,” how can we deduce anything other than that the majority holds that temporal considerations, such as the duration of the impairment, are irrelevant? Furthermore, if temporal considerations are not irrelevant, why does the majority not explain in what way these are relevant, or how, in fact, the majority views the relevancy of temporal considerations, and how these views differ from those expressed in Kreiner? This glaring void in explanation of its own test in the majority opinion can only be explained by the fact that the majority is holding that temporal considerations are wholly or largely irrelevant.
*255 In sum, if temporal considerations are relevant: (1) why is the majority overruling Kreiner; (2) why does the majority reject Kreiner’s factors, such as the duration of the impairment; (3) why does the majority not include temporal considerations within its new test; (4) why does the majority fail to explain the relevancy of temporal considerations; (5) why does the majority conclude that it is unnecessary to consider whether the impairment “continues to affect [plaintiffs] general ability to lead his pre-incident ‘normal life’ ”; and (6) perhaps most tellingly, why does not the majority clarify its position, whatever it may be, in light of this dissent? Simply saying that our conclusion is “erroneous” does not make it so, and, even more to the point, will hardly assist the bench and bar of this state in determining whether, and how, temporal considerations somehow remain relevant after today’s decision.
For these reasons, we are unable to avoid the conclusion that the majority is, indeed, holding that temporal considerations are wholly or largely irrelevant, even though this “improbable” result constitutes a departure from Cassidy, DiFranco, and Kreiner, and makes utterly no sense. How can it possibly be determined whether an impairment “affects the person’s general ability to lead his or her normal life” without taking into account temporal considerations? As Kreiner, 471 Mich at 133 n 18, inquired:
Does the dissent [now the majority] really believe that an impairment lasting only a few moments has the same effect on a person’s “general ability to lead his or her normal life” as an impairment lasting several years or that an impairment requiring annual treatment has the same effect on a person’s “general ability to lead his or her normal life” as an impairment requiring daily treatment?
*256 Does the majority really believe that the Legislature intended for the serious impairment threshold to be met in every instance where an objectively manifested impairment of an important body function affected a person’s ability to lead his normal life for a mere moment in time? What if a person gets hit in the head and passes out for five minutes, but after those five minutes is completely unaffected by the impairment? If all temporal considerations are irrelevant, would not this person satisfy the majority’s threshold, because his general ability to lead his normal life was certainly affected for those five minutes of unconsciousness? Under the majority’s rule, it is apparently irrelevant that the person arose after those five minutes and led a completely normal life thereafter. The majority asserts that all that matters is that for that moment in time, the person’s general ability to lead his normal life had been affected. I am not sure that the majority’s new threshold can even be called a “threshold” when it can be satisfied in virtually every automobile accident case that results in injury.[29] As long as the plaintiff has suffered an objectively manifested impairment of an important body function, that plaintiff will have satisfied the majority’s threshold, because the majority has essentially read the third criterion, i.e., “that affects the person’s general ability to lead his or her normal life,” out of the statute.
The clearest illustration of the difficulty in determining whether an impairment “affects the person’s general ability to lead his or her normal life” without taking into account temporal considerations is the *257 majority’s own inability to do so.[30] In determining whether the plaintiff in the instant case suffered an impairment that affects his general ability to lead his normal life, the majority itself repeatedly cites temporal considerations. For example, the majority indicates that “for a month after the incident, plaintiff could not bear weight on his left ankle”; “[h]e underwent two surgeries over a period of 10 months and multiple months of physical therapy”; “after the incident he was unable to perform functions necessary for his job for at least 14 months”; and “he did not return to work for 19 months.” (Emphasis added.) Are such temporal considerations irrelevant or relevant? Do we interpret the words or the actions of the majority? And, if temporal considerations are irrelevant, how are we to determine whether an impairment affects a plaintiffs “general ability to lead his or her normal life”? The majority does not appear to know the answers, and it appears not to care that it does not know.
Indeed, under the majority’s new threshold, it would seem that the moment the plaintiff in this case went to *258 the emergency room and it was determined that he had broken his ankle, the threshold was met. For at that moment, plaintiff could not work. While at the emergency room, and for some measurable time afterwards, plaintiffs broken ankle affected not just some, but all of his capacity to live his normal life. Under the majority’s non-temporal test, there is apparently no need to consider anything beyond the emergency room visit. If this reading of its decision is wrong, once again, the majority might wish to explain why this is so for the benefit of the bench, the bar, and the public.
In crafting its new threshold, the majority would also have been wise to consider the larger no-fault statute. Recall that the Legislature has decided that an injured plaintiff should only be allowed to sue to recover noneconomic damages resulting from an automobile accident where he or she has suffered: (a) death; (b) permanent serious disfigurement; or (c) serious impairment of body function. MCL 500.3135. It is well established that “ [w]hen construing a series of terms ... we are guided by the principle that words grouped in a list should be given related meaning.’ ” In re Complaint of Rovas Against SBC Mich, 482 Mich 90, 114; 754 NW2d 259 (2008) (citation omitted). “In other words, this Court applies the doctrine of noscitur a sociis, which ‘stands for the principle that a word or phrase is given meaning by its context of setting.’ ” Id. (citation omitted). Therefore, as this Court explained in Cassidy, 415 Mich at 503:
In determining the seriousness of the injury required for a “serious impairment of body function”, this threshold should be considered in conjunction with the other threshold requirements for a tort action for noneconomic loss, namely, death and permanent serious disfigurement. MCL 500.3135 .... The Legislature clearly did not intend to *259 erect two significant obstacles to a tort action for noneconomic loss and one quite insignificant obstacle.[31]
In addition, the Legislature defined “serious impairment of body function” to mean “an objectively manifested impairment of an important body function that affects the person’s general ability to lead his or her normal life.” MCL 500.3135(7). Obviously, in enacting this threshold language, and in joining it with “death” and “serious permanent disfigurement,” the Legislature was unlikely to have had in mind an impairment that only affected a plaintiffs ability to lead his normal life for a moment in time, with no consideration being given to the plaintiffs general ability to lead his normal life beyond that moment. Indeed, it is quite certain that this is not what the Legislature had in mind, given that the very premise of the no-fault act, and the core of the accompanying legislative compromise, was that some injured persons would not be able to recover noneconomic damages, so that all injured persons would be able to recover economic loss benefits regardless of fault.
D. APPLICATION
As explained earlier, both Kreiner and the majority agree that the court must first determine whether there is a factual dispute that is material to the determination whether plaintiff has suffered a serious impairment of body function. Here, there are no material factual *260 disputes. Before the accident, plaintiff worked approximately 60 hours a week and for the six months immediately before the accident, plaintiffs position was that of a medium-duty truck loader. Additionally, plaintiff fished and golfed. Twelve months after the accident, plaintiffs surgeon cleared him to return to work with no restrictions. Seventeen months after the accident, plaintiff returned to work and has been able to perform all of his job duties since then. During the entire time he was recuperating, plaintiff could tend to his needs and there was no effect on his relationship with his thenfiancée. Additionally, plaintiff continued to fish and golf. Thus, I agree with the majority that there are no factual disputes that are material to the determination of whether plaintiff suffered a serious impairment of a body function. The facts are clear.
I also agree with the majority that the “body function” that was “impaired,” the ability to walk, was “important,” and that the impairment was “objectively manifested.” Although plaintiff was able to walk to some extent, his ability to do so was impaired, and his impairment, a broken ankle, was recognized by his doctors. The final, and critical, inquiry in this case concerns whether the impairment affected plaintiffs general ability to lead his normal life. This is where the majority and I depart. The Kreiner analysis requires a comparison of plaintiffs life before the accident and after the accident, including “the significance of any affected aspects on the course of the plaintiffs overall life.” Kreiner, 471 Mich at 132-133. To aid in this analysis, the following factors may be considered:
(a) the nature and extent of the impairment, (b) the type and length of treatment required, (c) the duration of the impairment, (d) the extent of any residual impairment, and (e) the prognosis for eventual recovery. [Id. at 133.]
*261 Plaintiffs ability to walk, as just noted, was impaired by a broken ankle. However, once plaintiffs ankle was placed in a cast at the emergency room, he was able to walk with the aid of crutches. And, immediately following his initial surgeiy in which a device was implanted to stabilize his ankle, plaintiff was still able to walk with crutches, although he was instructed not to place any weight on his ankle for one month. Plaintiff underwent physical therapy and nine months later, in October 2005, plaintiff again underwent surgery to remove the device. By January 2006 (one year after the accident), plaintiffs surgeon had cleared plaintiff to return to work with no restrictions. However, plaintiff claimed that he could not keep up with the demands of his job and thus was placed back on workers’ compensation. Although plaintiffs subjective reports of his pain from January 2006 forward varied greatly,[32] the March 2006 FCE supported plaintiffs claim that he could not fully perform all of his previous job duties; however, this was due in part to a preexisting and unrelated shoulder injury. After plaintiffs workers’ compensation benefits were terminated, however, plaintiff requested another FCE, and, on August 1, 2006, the FCE showed that plaintiff was able to perform essential job demands with no restrictions. Plaintiff returned to work on August 16, 2006, and has been able to perform his job duties since that time.
*262 Although plaintiff was assigned to a position that was less physically demanding than the position he had been performing before he was injured, plaintiff did this voluntarily and he suffered no loss in pay. Moreover, at the time plaintiff was injured, he had only been in that position for six months and, since he began to work for Allied in 2002, he had worked in three different positions. Thus, the fact that defendant was assigned to a different position upon his return is not particularly significant in this Court’s analysis.
Plaintiffs only argument regarding his inability to lead his normal life is that he was unable to work at certain times. During the time he was recuperating, plaintiff could care for himself and tend to his household chores without assistance. His relationship with his fiancée/wife was unaffected. And he was able to enjoy his recreational activities without interruption. By plaintiffs own admission, his life was “normal” with some “occasional aching” that was not aggravated by any activities, including standing or prolonged walking. It is fair to say that by August 2006 plaintiff had fully recovered from his broken ankle. Because only plaintiffs ability to work was affected and because this only lasted, at most, 17 months, the lower courts did not err in concluding that the impairment did not affect plaintiffs general ability to lead his normal life and, therefore, that plaintiff did not meet the “serious impairment of body function” threshold.
E. STARE DECISIS
The majority overrules Kreiner while paying its usual lip service to stare decisis.[33] My fundamental disagree *263 ment with the majority’s application of the stare decisis doctrine is quite easily summarized. In Robinson v Detroit, 462 Mich 439, 464; 613 NW2d 307 (2000), this Court drew on past caselaw and identified several relevant considerations in determining whether a case should be overruled under stare decisis.[34] As explained *264 herein, Kreiner was the first occasion on which this Court was called upon to interpret the 1995 amendments to MCL 500.3135. Kreiner gave effect to the legislative intent as expressed in the language of the amended statute and was not, in my judgment, wrongly decided. Nonetheless, my disagreement with the majority on this point is not the thrust of this section. Rather, it is to remind the majority “that there are larger issues at stake in this case: the rule of law, respect for precedent, the integrity of this Court, and judicial restraint. Accordingly, larger institutional issues are implicated in this case.” Paige v Sterling Hts, 476 Mich 495, 543; 720 NW2d 219 (2006) (CAVANAGH, J., concurring in part and dissenting in part).
Indeed, the author of the majority opinion, as one who subscribes to the doctrine of legislative acquiescence, has often argued that principles of stare decisis are especially strong in matters of statutory interpretation.[35] Accordingly, his own words are relevant here:
*265 “[T]he majority does not adequately explain why it disregards the doctrine of stare decisis in a matter of statutory interpretation when the Legislature itself has not seen fit in [six] years to correct [Kreiner’s] allegedly incorrect interpretation.” Id. at 536. To be fair, it is not only the author of the majority opinion, but all the justices who comprise the majority who should more clearly recognize the consequences of what they are doing. Even a cursory analysis of the majority’s treatment of precedent since it ascended to power in January 2009 reveals a lack of sufficient regard for recent precedents that is directly contrary to their own previous assertions of the need not to needlessly overrule cases on account of stare decisis. Past complaints on *266 their part that cases should not be overruled when the only thing that has changed is the membership of the Court have gone by the wayside.[36]
1. MAJORITY AND PRECEDENT IN 2009
The new majority assumed power in January 2009, and wasted little time in beginning its efforts to “undo” decisions of the previous majority.[37] On December 29, 2008, the former majority issued its opinion in United States Fidelity Ins & Guaranty Co v Mich Catastrophic Claims Ass’n, 482 Mich 414, 417; 759 NW2d 154 (2008). Soon after Justice HATHAWAY replaced former Chief Justice TAYLOR on January 1, 2009, the plaintiffs filed motions for rehearing. The new majority granted the plaintiffs’ motions for rehearing, and the cases were resubmitted for decision “without further briefing or oral argument.” 483 Mich 918 (2009). Then, in United States Fidelity & Guaranty Co v Mich Catastrophic Claims Ass’n (On Rehearing), 484 Mich 1, 26; 795 NW2d 101 (2009), the new majority reversed the former majority’s decision.
*267 In Bush v Shabahang, 484 Mich 156, 175 n 34; 772 NW2d 272 (2009), the majority stated that it “question[ed] whether Roberts I [Roberts v Mecosta Co Gen Hosp, 466 Mich 57; 642 NW2d 663 (2002)] and Boodt [v Borgess Med Ctr, 481 Mich 558; 751 NW2d 44 (2008)] were correctly decided . . . And, in Potter v McLeary, 484 Mich 397, 424 n 32; 774 NW2d 1 (2009), the majority said: “We question whether Roberts II [Roberts v Mecosta Co Gen Hosp (After Remand), 470 Mich 679; 684 NW2d 711 (2004)] was correctly decided . . .
The majority’s treatment of precedent in the seven-month period from when it took power until the end of the Court’s term in July 2009 was well explained in earlier statements of mine and of Justices CORRIGAN and YOUNG. For example, in Henry v Dow Chem Co, 484 Mich 483, 528 n 28; 772 NW2d 301 (2009), Justice YOUNG observed in his partial dissent:
The majority’s determination to ignore facts and precedent inconvenient to its desired outcome has become its modus operandi. See, e.g., Vanslembrouck v Halperin, 483 Mich 965 (2009), where the new majority ignored Vega v Lakeland Hospitals at Niles & St Joseph, Inc, 479 Mich 243, 244; 736 NW2d 561 (2007); Hardacre v Saginaw Vascular Services, 483 Mich 918 (2009), where it failed to follow Boodt v Borgess Med Ctr, 481 Mich 558; 751 NW2d 44 (2008); Sazima v Shepherd Bar & Restaurant, 483 Mich 924 (2009), where it failed to follow Chrysler v Blue Arrow Transport Lines, 295 Mich 606; 295 NW 331 (1940), and Camburn v Northwest School Dist, 459 Mich 471; 592 NW2d 46 (1999); Juarez v Holbrook, 483 Mich 970 (2009), where it failed to follow Smith v Khouri, 481 Mich 519; 751 NW2d 472 (2008);[38] Chambers v Wayne Co Airport Auth, *268 483 Mich 1081 (2009), where it failed to follow Rowland v Washtenaw Co Rd Comm, 477 Mich 197; 731 NW2d 41 (2007);[39] and Scott v State Farm Mut Auto Ins Co, 483 Mich 1032 (2009), where it failed to enforce Thornton v Allstate Ins Co, 425 Mich 643; 391 NW2d 320 (1986), and Putkamer v Transamerica Ins Corp of America, 454 Mich 626; 563 NW2d 683 (1997).
And, as Justice CORRIGAN stated in her dissenting statement in Beasley v Michigan, 483 Mich 1025, 1029-1030 (2009):
[T]he new majority’s failure to abide by Rowland continues a growing and troubling trend. Rather than forthrightly overruling that decision, it is increasingly becoming the practice of this Court to simply ignore precedents with which it disagrees....
On this Court, the new majority offers no articulable reasons whatsoever for its apparent detours from stare decisis. Instead, the majority declines to explain whether — and, if so, why — it is overruling precedent despite the obvious appearance that it is doing so. If it intends to alter legal principles embedded in this Court’s decisions, then the new majority should explain its reasons clearly and intelligibly. Instead, the new majority overrules by indirection, or at least leaves the impression that it is doing so, thereby sowing the seeds of confusion and making it difficult for the citizens of this state to comprehend precisely what our caselaw requires. This appears to be an unfortunate return to our predecessors’ past practice of *269 “frequently pa[ying] little attention to the inconsistencies among its cases and declin [ing] to reduce confusion in [the Court’s] jurisprudence by overruling conflicting decisions.” Devillers v Auto Club Ins Ass’n, 473 Mich 562, 571 n 19 [702 NW2d 539] (2005).[40]
Additionally, in Petersen, 484 Mich at 313-326, Chief Justice KELLY authored an opinion, joined only by Justice CAVANAGH, in which she indicated that she wanted to overrule Robinson and Lansing Mayor v Pub Serv Comm, 470 Mich 154; 680 NW2d 840 (2004). In my dissent, I stated:
Given that in this case the Chief Justice would expressly overrule, not one, but two of this Court’s prior decisions, “one is naturally tempted to re-inquire, see Rowland v Washtenaw Co Rd Comm, 477 Mich 197, 223-228; 731 NW2d 41 (2007) (Markman, J., concurring), whether the ongoing dispute between the [former] majority and Justice KELLY over overrulings of precedent truly concerns attitudes toward stare decisis or merely attitudes toward particular previous decisions of this Court.” [People v Smith, 478 Mich 292, 322-323 n 17; 733 NW2d 351 (2007).] “A justice’s perspective on stare decisis is not evidenced by her willingness to maintain precedents with which she agrees, but by her willingness to maintain precedents with which she disagrees.” Rowland, 477 Mich at 224-225 n 3 (Markman, J., concurring). Now that the Chief Justice is positioned to overrule decisions with which she disagrees, her actions increasingly demonstrate that her former claims of fealty toward stare decisis were considerably overstated. Despite all her rhetoric concerning the impor *270 tance of stare decisis for the exercise of the judicial power, see, e.g., her hollow claim that she possessed a “differing [and elevated] esteem for stare decisis” than another justice, People v Gardner, 482 Mich 41, 88 n 31; 753 NW2d 78 (2008), such rhetoric was in reality little more than a means of communicating her opposition to overruling particular past decisions with which she agreed. [Petersen, 484 Mich at 389-390 (Markman, J., dissenting) (emphasis in the original).]
One other practice to which the new majority began to adhere in 2009 was requesting that the parties brief whether a decision of the former majority should be overruled. See, e.g., Justice Young’s partial dissent in Potter, 484 Mich at 450 n 43, in which he stated:
It is quickly becoming a new favored practice of the majority to flag decisions of the past decade and invite challenges to those decisions. It is difficult to reconcile this practice with the majority’s previous claims of fidelity to stare decisis. See, e.g.,... Pohutski v City of Allen Park, 465 Mich 675, 712; 641 NW2d 219 (2002) (Kelly, J., dissenting) (“[I]f each successive Court, believing its reading is correct and past readings wrong, rejects precedent, then the law will fluctuate from year to year, rendering our jurisprudence dangerously unstable.”); Devillers, supra at 620 (WEAVER, J., dissenting) (“Under the doctrine of stare decisis, it is necessary to follow earlier judicial decisions when the same points arise again in litigation.”); Rowland v Washtenaw Co Rd Comm, 477 Mich 197, 278; 731 NW2d 41 (2007) (Cavanagh, J., dissenting) (“Under the doctrine of stare decisis, principles of law deliberately examined and decided by a court of competent jurisdiction become precedent and should not be lightly departed. Absent the rarest circumstances, we should remain faithful to established precedent.”).... See also Todd C. Berg, Esq., Hathaway Attacks, Michigan Lawyers Weekly, October 27, 2008, in which Justice HATHAWAY was quoted: “I believe in stare decisis. Something must be drastically wrong for the court to overrule”; Lawyers’ Election Guide: Judge Diane Marie Hathaway, Michigan Lawyers Weekly, October 30, 2006, in *271 which Justice HATHAWAY, then running for a position on the Court of Appeals, was quoted: “Too many appellate decisions are being decided by judicial activists who are overturning precedent.”
Thus, from January 2009 through July 31, 2009, the new majority reversed an opinion on rehearing, sowed seeds of confusion by questioning three cases decided by the former majority, i.e., Roberts I, Roberts II, and Boodt, failed to follow numerous other precedents, as cited above, and began to issue orders requesting that the parties brief whether decisions made by the former majority should be overruled.[41] And Chief Justice KELLY and Justice CAVANAGH went on record urging the express overruling of two cases: Robinson and Lansing Mayor.
2. MAJORITY AND PRECEDENT IN 2010
In 2010, the majority has accelerated efforts to “undo” numerous cases decided by the former majority through express overrulings and additional orders asking parties to brief whether a case should be overruled.
*272 In People v Feezel, 486 Mich 184; 783 NW2d 67 (2010), the majority expressly overruled People v Derror, 475 Mich 316; 715 NW2d 822 (2006). In Lansing Sch Ed Ass’n v Lansing Bd of Ed, 487 Mich 349; 792 NW2d 686 (2010), the majority overruled Lee v Macomb Co Bd of Comm’rs, 464 Mich 726; 629 NW2d 900 (2001), Crawford v Dep’t of Civil Serv, 466 Mich 250; 645 NW2d 6 (2002), Nat’l Wildlife Federation v Cleveland Cliffs Iron Co, 471 Mich 608; 684 NW2d 800 (2004), Associated Builders & Contractors v Dep’t of Consumer & Indus Servs Dir, 472 Mich 117; 693 NW2d 374 (2005), Mich Chiropractic Council v Comm’r of the Office of Fin & Ins Servs, 475 Mich 363; 716 NW2d 561 (2006), Rohde v Ann Arbor Pub Sch, 479 Mich 336; 737 NW2d 158 (2007), Mich Citizens for Water Conservation v Nestlé Waters North America Inc, 479 Mich 280; 737 NW2d 447 (2007), and Manuel v Gill, 481 Mich 637; 753 NW2d 48 (2008). In Bezeau v Palace Sports & Entertainment, Inc, 487 Mich 455; 795 NW2d 797 (2010), the majority expressly overruled the limited retroactive effect of Karaczewski v Farbman Stein & Co, 478 Mich 28; 732 NW2d 56 (2007). In Univ of Mich Regents v Titan Ins Co, 487 Mich 289; 791 NW2d 897 (2010), the majority expressly overruled Cameron v Auto Club Ins Ass’n, 476 Mich 55; 718 NW2d 784 (2006). In O’Neal v St John Hosp & Med Ctr, 487 Mich 485, 506 n 22; 791 NW2d 853 (2010), the lead opinion authored by Justice HATHAWAY indicated its agreement with Justice CAVANAGH’s partial dissent in Wickens v Oakwood Healthcare Sys, 465 Mich 53, 63-67; 631 NW2d 686 (2001), which already had the support of three justices (Chief Justice KELLY and Justices CAVANAGH and WEAVER). And, of course, in the case at bar, the majority has expressly overruled Kreiner. Finally, by amending MCR 2.112 and MCR 2.118 to allow amendments of affidavits of merit to *273 relate back to the of the original filing of the affidavit, the majority effectively overruled Kirkaldy v Rim, 478 Mich 581; 734 NW2d 201 (2007). 485 Mich cclxxv, cclxxvi (2010).
3. OVERRULINGS OF PRECEDENT TO COME
The majority’s work, however, has apparently only just begun. In orders granting applications for leave to appeal, it has already teed up six more cases for possible overruling. These include: Mich Citizens for Water Conservation v Nestlé Waters North America Inc, 479 Mich 280; 737 NW2d 447 (2007);[42] Preserve the Dunes, Inc v Dep’t of Environmental Quality, 471 Mich 508; 684 NW2d 847 (2004);[43] Trentadue v Buckler Automatic Lawn Sprinkler Co, 479 Mich 378; 738 NW2d 664 (2007);[44] Griffith v State Farm Mut Auto Ins Co, 472 Mich 521; 697 NW2d 895 (2005);[45] Rory v Continental *274 Ins Co, 473 Mich 457; 703 NW2d 23 (2005) ;[46] and Rowland v Washtenaw Co Rd Comm, 477 Mich 197; 731 NW2d 41 (2007).[47]
The new majority once purported to be concerned about the stability of the law,[48] but that concern appears to have passed with the passing of the former majority. Indeed, it is difficult to consider anything more destabilizing to the law than to have the majority issue multiple orders continually requesting that the parties brief whether recently decided cases have been properly decided. Justices who once postured as champions of stare decisis now cannot act quickly enough to overrule disfavored precedents. The majority’s past claims of fealty to stare decisis were greatly exaggerated, and obviously nothing more than a function of their opposition to particular decisions being decided by the Court at the time.
4. HYPOCRISY AND STARE DECISIS
The majority accuses the dissenting justices of hypocrisy with regard to our stare decisis criticisms of the majority.
*275 The dissenters’ stare decisis protestations should taste like ashes in their mouths. To the principles of stare decisis, to which they paid absolutely no heed as they denigrated the wisdom of innumerable predecessors, the dissenters now would wrap themselves in its benefits to save their recent precedent. [Ante at 209 n 21.]
However, the position of the dissenting justices on stare decisis has not changed a whit since we were in the majority; by contrast, the position of the majority justices is unrecognizable.
It has always been our position that stare decisis is not an “inexorable command,” and that a judge’s primary obligation is to the law and the constitution, not to the judgments of his or her predecessors. To that end, we have always asserted that there are multiple judicial values that must be assessed in any case in which previous decisions of the Court are implicated. In every such case, a judge must respectfully consider the interests served by stare decisis — predictability and certainty in the law, and the uniformity of its application. However, in every such case, a judge must also consider the interests served by interpreting the law correctly— regard for the lawmaker, adherence to constitutional dictates concerning the “judicial power” and the separation of powers, and competing predictability and certainty interests that are served where the law means what it plainly says. Robinson, 462 Mich at 464-468. As we explained in Robinson:
[I]t is well to recall in discussing reliance, when dealing with an area of the law that is statutory ..., that it is to the words of the statute itself that a citizen first looks for guidance in directing his actions. This is the essence of the rule of law: to know in advance what the rules of society are. Thus, if the words of the statute are clear, the actor should be able to expect, that is, rely, that they will be carried out by all in society, including the courts. In fact, *276 should a court confound those legitimate citizen expectations by misreading or misconstruing a statute, it is that court itself that has disrupted the reliance interest. When that happens, a subsequent court, rather than holding to the distorted reading because of the doctrine of stare decisis, should overrule the earlier court’s misconstruction. The reason for this is that the court in distorting the statute was engaged in a form of judicial usurpation that runs counter to the bedrock principle of American constitutionalism, i.e., that the lawmaking power is reposed in the people as reflected in the work of the Legislature, and, absent a constitutional violation, the courts have no legitimacy in overruling or nullifying the people’s representatives. Moreover, not only does such a compromising by a court of the citizen’s ability to rely on a statute have no constitutional warrant, it can gain no higher pedigree as later courts repeat the error. [Id. at 467-468.]
That has been the consistent approach of the dissenting justices, and this continues to be our approach. Respect for stare decisis is a critical judicial value, but so is a regard for the constitutional processes of government by which a judge strives to interpret the law in accordance with its actual language. Balancing these values is sometimes difficult, and reasonable people can often disagree as to how this balance should be struck. Robinson supplies one attempt at identifying the factors that courts have traditionally looked to in striking this balance in a consistent and reasonable manner. Despite suggestions to the contrary, Robinson does not establish a “mechanical” process, but simply attempts to afford reasonable guidance in achieving a fair equilibrium between stare decisis and getting the law right.[49]
*277 However, as explained above, the justices now in the majority who were on the Court at the time took a quite different approach to stare decisis when they were in the minority. As Justice YOUNG has explained:
[Our] position on stare decisis has not changed, and the [the majority] attempts to shift focus to [us] in order to avoid confronting [their] own inconsistency. The public should understand when justices’ positions on important matters shift. And that is the focus of this dissent: when the [majority] justice[s] [were] in the minority, [they] liked stare decisis a lot; now that [they are] in the majority, it is not an issue. That is the “irony” the public should understand. [Anglers, 486 Mich at 993 (2010) (Young, J., dissenting).]
The majority entirely misapprehends our criticism of its record on stare decisis if it thinks that we are simply counting the number of occasions on which they have overruled precedent over the past term and a half. That is not our intention at all. We freely acknowledge that we too overruled precedents when we were in the majority— although hardly at their remarkable pace. That is not the nub of our critique. Rather, the nub is: (a) that the majority justices have demonstrated a remarkably inconsistent and “flexible” attitude toward stare decisis, in which their views on the subject appear to be nothing more than a function of whether they are in the majority or the minority; and (b) that the majority justices equate their own overrulings of precedent, in which they have widened the distance between the law of the lawmaker and the law of the court, with the previous majority’s overrulings, in which we did the opposite.
“[N]o meaningful discussion of a court’s attitude toward precedent can be based solely on an arithmetical analysis in which raw numbers of overrulings are simply counted. Such an analysis obscures that not all precedents are built alike, that some are better reasoned than others, *278 that some are grounded in the exercise of discretionary judgments and others in the interpretation of plain language, that some are thorough in their analyses and others superficial.” Rowland, 477 Mich at 226 (Markman, J., concurring). The chart set forth in Rowland demonstrates, we believe, that the overrulings of precedent that occurred between January 1, 2000, until Rowland was decided on May 2, 2007, “overwhelmingly came in cases involving what the justices in the majority [at that time] view[ed] as the misinterpretation of straightforward words and phrases in statutes and contracts, in which words that were not there were read into the law or words that were there were read out of the law.” Id. That is, these overrulings of precedent sought more closely to equate our state’s caselaw with our statutes, while the overrulings of precedent of the present majority have achieved exactly the opposite.
Thus, the present majority has regard neither for precedent nor for the most significant competing value that would sometimes warrant overturning a precedent, to wit, that it is not in accord with the words of the lawmaker. In the end, the majority’s approach to stare decisis is empty and incoherent. The majority has unsettled the precedents of this Court at a Guinness world’s record pace, and it has done so while disserving both the values of stare decisis and that of a court acting in accordance with the constitutional separation of powers to respect the decisions of the lawmaker. The majority has run amuck in service of values that have no grounding in either stare decisis or any other conception of the “judicial power,” other than that they comprise an arithmetical majority of this Court. In this regard, the majority confuses power and authority. The majority unsettles and confuses the law both in its disregard for this Court’s previous decisions and in its equal disregard for the language of the law. It com *279 pounds the confusion it fosters in one realm with the confusion that it fosters in the other.[50] There is no saving grace in its overrulings of precedent, no balancing of difficult judicial principles, no apparent recognition of the values served by either of the competing considerations involved where precedents are at issue, and no thoughtful effort to articulate even the roughest principles for its actions. In its destructive march through the caselaw of this state to identify surviving and straggling decisions that need to be “taken out,” the majority furthers no discernible legal value of any kind, other than litigation and still more litigation. In the end, there is no legal core to the majority’s approach to stare decisis, and it is left with nothing other than a feeble effort to equate its own actions with those of the dissenting justices when they were in the majority. “We are no worse than you” is the majority’s banner, when in truth the majority has not the slightest conception of our approach to stare decisis, and not the slightest conception of the damage that their own approach to stare decisis is doing to the citizens of this state who wish to act in accordance with the law and who wish to understand their rights and obligations under that law.
E UNDOING THE LEGISLATIVE COMPROMISE
As discussed earlier, although virtually all legislation involves some sort of compromise, the no-fault act, in particular, entailed a substantial and well-understood compromise. In exchange for the payment of economic *280 loss benefits from one’s own insurance company (first-party benefits), the Legislature limited an injured person’s ability to sue a negligent operator or owner of a motor vehicle for noneconomic losses (third-party benefits). Kreiner, 471 Mich at 114-115. As stated in Stephens v Dixon, 449 Mich 531, 541; 536 NW2d 755 (1995): “It was a specific purpose of the Legislature in enacting the Michigan no-fault act to partially abolish tort remedies for injuries sustained in motor vehicle accidents and to substitute for those remedies an entitlement to first-party insurance benefits.”
At least two reasons are evident concerning why the Legislature limited recovery for noneconomic loss, both of which relate to the economic viability of the system. First, there was the problem of the overcompensation of minor injuries. Second, there were the problems incident to the excessive litigation of motor vehicle accident cases. Regarding the second problem, if noneconomic losses were always to be a matter subject to adjudication under the act, the goal of reducing motor vehicle accident litigation would likely be illusory. The combination of the costs of continuing litigation and continuing overcompensation for minor injuries could easily threaten the economic viability, or at least desirability, of providing so many benefits without regard to fault. If every case is subject to the potential of litigation on the question of noneconomic loss, for which recovery is still predicated on negligence, perhaps little has been gained by granting benefits for economic loss without regard to fault.
Regarding the trade-off involved in no-fault acts, 7 Am Jur 2d, Automobile Insurance, § 340, p 1068, contains the following:
“It has been said of one such plan that the practical effect of the adoption of personal injury protection insurance is to afford the citizen the security of prompt and certain recovery to a fixed amount of the most salient elements of his out-of-pocket expenses * * *. In return for this he surrenders the possibly minimal damages for pain and suffering recoverable in cases not marked by serious *281 economic loss or objective indicia of grave injury, and also surrenders the outside chance that through a generous settlement or a liberal award by a judge or jury in such a case he may be able to reap a monetary windfall out of his misfortune.” (Footnotes omitted.)
Thus, it is apparent that the threshold requirements for a traditional tort action for noneconomic loss play an important role in the functioning of the no-fault act. [Cassidy, 415 Mich at 500-501.]
Accordingly, there is no question that the legislative compromise that produced the no-fault act recognized that some injuries would not be considered sufficient to meet the no-fault threshold. While every injury resulting from a motor vehicle accident certainly has adverse consequences, and may involve medical costs, treatment, and bodily pain, not all injuries rise to the level of the no-fault threshold of a “serious impairment of body function.” Some injured persons are able to recover noneconomic damages, so that all injured persons are able to recover economic loss benefits regardless of fault. Otherwise, “little has been gained by granting benefits for economic loss without regard to fault.” Id. at 500. Indeed, “the excessive litigation of motor vehicle accident cases” would continue, and, yet, economic loss benefits would have to be paid regardless of fault. Id. In other words, plaintiffs would be able to recover economic loss benefits regardless of fault and without having to go to a jury, while these same plaintiffs would also be able to go to a jury and seek noneconomic benefits as well. That is not the compromise reached by the Legislature. In particular, it is a lose-lose proposition for those funding the no-fault system, i.e., all insured Michigan drivers.[51]
*282 In addition, it has been repeatedly recognized that, due to the mandatory nature of no-fault insurance, the Legislature intended that its cost be affordable. Shavers, 402 Mich at 599 (“The Legislature has . . . fostered the expectation that no-fault insurance will be available at fair and equitable rates.”).[52] Indeed, because it is mandatory, it must be affordable. Id. at 600 (“We therefore conclude that Michigan motorists are constitutionally entitled to have no-fault insurance made available on a fair and equitable basis.”). It is a matter of economic logic that in order to maintain a system in which motor vehicle accident victims are able to receive economic loss benefits regardless of fault, drivers must be required to purchase insurance, and in order to ensure that drivers purchase this insurance, it must be kept affordable. The majority’s decision, however, very considerably “lowers the bar” that an injured plaintiff must satisfy in order to meet the serious impairment of *283 body function threshold, making it significantly easier for a plaintiff to recover for noneconomic losses. This means insurance companies that issue no-fault policies will be financially obligated in more cases and, as a result, will be required to pass along their increased costs to policyholders by way of increased premiums charged to Michigan drivers.[53] Today’s decision, just as last term’s decision by the new majority in United States Fidelity (On Rehearing9,[54] will eventually result in a substantial increase in premiums paid for their mandatory no-fault policies.[55]
*284 Every owner of a car that is driven on a public highway must buy certain basic coverages in order to register the vehicle and obtain license plates. MCL 500.3101(1). The Legislature has provided two incentives to ensure that owners purchase the required insurance. First, it is a misdemeanor to drive a motor vehicle without basic no-fault coverage. Under MCL 500.3102(2), if someone is convicted of driving without basic no-fault insurance coverage, he or she can be fined up to $500, incarcerated in jail for up to one year, or both. Second, the no-fault act precludes receipt of no-fault personal protection insurance benefits if at the time of the accident the person was the owner or registrant of an uninsured motor vehicle involved in the accident. MCL 500.3113(b). Notwithstanding this criminal sanction, and this potential preclusion of no-fault benefits, it is estimated that 17 percent[56] of Michigan’s approximately 8 million motor vehicles[57] are still operated without a no-fault policy in effect. With such mandatory policies now becoming even more expensive, one can also reasonably anticipate a corresponding increase in the already large number of uninsured vehicles being driven on our roads and highways.
*285 The majority’s decision will not only result in increased automobile insurance premiums, and more uninsured vehicles on our roads and highways, but it will also mean that substantially more lawsuits will be filed, even though an express goal of the no-fault act was to reduce “excessive litigation of motor vehicle accident cases.” Cassidy, 415 Mich at 500. Yet, under the majority’s opinion, more lawsuits will make their way to juries for the consideration of noneconomic loss benefits, straining our already overburdened courts.[58] *286 As it is, no-fault automobile negligence cases remain a dominant factor in Michigan civil filings every year. Indeed, of the 47,300 new civil case filings in Michigan circuit courts in 2009, 9,067 — approximately 20 percent of all civil cases — were automobile related.[59] Given that many no-fault claims are settled without the filing of a lawsuit, the number of claims potentially affected by the majority’s ruling is even higher.
The majority’s decision will also increase the costs incurred by the state of Michigan itself (and, of course, the taxpayers who fund those costs). In the course of arguing that Kreiner should not be overruled because it “clarifies rather than expands the statutory language,” the Attorney General’s amicus curiae brief warns that if Kreiner is overruled, as a self-insured entity, the state will realize “a direct, significant increase in the cost of its litigation and coverage obligations.”[60]
Finally, and as a consequence of all the above, the majority’s decision will almost certainly call into question the long-term economic integrity of the present no-fault system in Michigan. By nullifying the legislative compromise that was struck when the no-fault act was adopted — a compromise grounded in concerns over excessive litigation, the over-compensation of minor injuries, and the availability of affordable insurance— *287 the Court’s decision today will restore a legal environment in which each of these hazards reappears and threatens the continued fiscal soundness of our no-fault system.[61]
IV CONCLUSION
The no-fault automobile insurance act, in MCL 500.3135(1), provides that “[a] person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement.” The issue here is whether plaintiff has suffered a serious impairment of body function. “ ‘[S]erious impairment of body function’ means an objectively manifested impairment of an important body function that affects the person’s general ability to lead his or her normal life.” MCL 500.3135(7).
In Kreiner, 471 Mich at 132-133, this Court held that in determining whether the impairment affects the plaintiffs general ability to lead his normal life, “a court should engage in a multifaceted inquiry, comparing the plaintiffs life before and after the accident as well as the significance of any affected aspects on the course of the plaintiffs overall life.” In addition, Kreiner indicated that certain factors, such as the duration of the impairment, may be of assistance in evaluating whether the plaintiffs general ability to lead his normal life has been affected. Id. at 133.
*288 The majority overrules Kreiner, rejecting these factors and holding that temporal considerations are wholly or largely irrelevant in determining whether an impairment affects the plaintiffs general ability to lead his or her normal life. The majority apparently holds instead that as long as a plaintiffs general ability to lead his normal life has been affected for even a single moment in time, the plaintiff has suffered a serious impairment of body function. This conclusion is at odds with the actual language of the statute and nullifies the legislative compromise embodied in the no-fault act. Because I believe that Kreiner was correctly decided and that temporal considerations are, in fact, highly relevant, and indeed necessary, in determining whether an impairment affects the plaintiffs general ability to lead his normal life, I would sustain Kreiner. By nullifying the legislative compromise over the no-fault act — a compromise grounded in concerns over excessive litigation, the over-compensation of minor injuries, and the availability of affordable insurance — the Court’s decision today will revive a legal environment in which each of these hazards reappears and threatens the continued fiscal integrity of our no-fault system.
Because I do not believe that the lower courts erred in concluding that plaintiff has not suffered a serious impairment of body function, I would affirm the judgment of the Court of Appeals.
Corrigan and Young, JJ., concurred with Markman, J.

 Before plaintiff began working for Allied, he installed windows. When he first began working for Allied, he loaded trains, and after approximately six months, he took a “utility job,” providing support to other departments as needed. In June 2004, he began working as a medium-duty truck loader.

 It is not altogether clear how long plaintiffs physical therapy actually lasted. In plaintiffs deposition, he indicated that he underwent “many months” of therapy. However, in his response to defendant’s motion for summary disposition, plaintiff indicated that he had six weeks of therapy. *229 And, during plaintiffs oral argument opposing defendant’s motion for summary disposition, plaintiffs counsel claimed that plaintiff underwent 18 weeks of therapy.

 An FCE is “an all-encompassing term to describe the physical assessment of an individual’s ability to perform work-related activity.” American Occupational Therapy Association <http://www.aota.org/ Consumers/WhatisOT/WI/Facts/35117.aspx> (accessed July 1, 2010).

 This was due in part to shoulder pain resulting from a preexisting and unrelated shoulder injury.

 A physiatrist is a medical doctor who practices physiatry, “a medical specialty for the treatment of disease and injury by physical agents, as exercise or heat therapy.” Random House Webster’s College Dictionary (1991).

 Plaintiff began receiving workers’ compensation in January 2005. Plaintiff claims that he lost $66,000 in wages, the difference between his salary and his workers’ compensation benefits for the time he was not working. However, the instant case only involves noneconomic damages. Lost wages are economic damages and are compensable as personal protection insurance benefits, MCL 500.3107(l)(b), and/or through a tort claim against the party at fault to recover excess economic losses, MCL 500.3135(3)(c).

 Plaintiffs wife has not brought a loss-of-consortium claim.

 Although the majority suggests that plaintiff returned to fishing at pre-injury levels by the spring and summer of 2006, the record indicates that plaintiffs fishing activities had never been interrupted. Plaintiff was asked if he “[sjtill fishfed] the same amount of time as [he] fished before the accident when [he] get[s] a chance,” to which plaintiff replied, “When I get a chance.” Furthermore, defendant argued in its motion for summary disposition that plaintiffs fishing activities were uninterrupted by the injury, and plaintiff did not dispute this. Plaintiff essentially conceded this fact and instead argued that the disruption in his fife as a result of his injuries was centered on his inability to work. Plaintiff also was a weekend golfer. The record reflects that since plaintiff returned to work in August 2006, he had only golfed once, using a golf cart. We do not know whether plaintiff was able to golf during the time between his accident in January 2005 and August 2006. Defendant argued in its motion for summary disposition that plaintiff continued to engage in his pre-accident level of golfing activily, and again plaintiff did not argue to the contrary.

 With GM’s bankruptcy, the parties stipulated to a change in case caption and a change of party, adding Allied Automotive Group, Inc., indemnitor of GM; plaintiffs employer, Allied Systems, is a subsidiary of Allied Automotive Group, Inc. This Court entered an order in accordance with this stipulation. 485 Mich 851 (2009).

 The injured person’s insurance company is responsible for all expenses incurred for medical care, recovery, and rehabilitation as long as the service, product, or accommodation is reasonably necessary and the charge is reasonable. MCL 500.3107(l)(a). There is no monetary limit on *235 such expenses, and this entitlement can last for the person’s lifetime. An injured person is also entitled to recover from his own insurance company up to three years of earnings loss, i.e., loss of income from work that the person would have performed if he had not been injured. MCL 500.3107(l)(b). An injured person can also recover “replacement” expenses, i.e., expenses reasonably incurred in obtaining ordinary and necessary services that the injured person would otherwise have performed. MCL 500.3107(l)(c). Further, an at-fault driver is still hable in tort for an injured person’s excess economic damages. MCL 500.3135(3)(c).

 In its entirety, MCL 500.3135(1) provides:
A person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle only if the injured person has suffered death, serious impairment of body function, or permanent serious disfigurement.

 That one exception is that while Cassidy, 415 Mich at 505, required an evaluation of “the effect of an injury on the person’s general ability to live a normal life,” MCL 500.3135(7) requires an evaluation of the effect of an injury on “the person’s general ability to lead his or her normal life.” (Emphasis added.) That is, while the Cassidy test was exclusively objective, the MCL 500.3135(7) test is at least partially subjective.

 If there is such a dispute, the court cannot decide the issue as a matter of law; however, if there is no such dispute, the court can so decide.

 “Subjective complaints that are not medically documented are insufficient.” Kreiner, 471 Mich at 132.

15 “While an injury need not be permanent, it must be of sufficient duration to affect the course of a plaintiffs life.” Id. at 135.

16 “Self-imposed restrictions, as opposed to physician-imposed restrictions, based on real or perceived pain do not establish this point.” Id. at 133 n 17.

 However, the majority indicates that this statute “could unconstitutionally conflict with MCR 2.116(0(10)....” Because I see no conflict between the statute and the court rule, i.e., each allows the court to determine as a matter of law whether a person has suffered a serious impairment of body function only if there are no material factual disputes, I do not believe the statute is in any way unconstitutional. *241 Moreover, the case cited by the majority in support of its suggestion that jury trials “promote judicial efficiency” actually stands for the exact opposite proposition. See Moll v Abbott Laboratories, 444 Mich 1, 26; 506 NW2d 816 (1993) (“Both our court rules and case law recognize the desirability of allowing summary disposition, regardless of a jury request, when uncontroverted facts are presented to the court. This promotes efficiency and preservation of judicial resources.”). It is interesting that, although the majority acknowledges that the constitutionality of MCL 500.3135(2)(a) is not at issue here, it repeatedly implies that MCL 500.3135(2)(a) “could” be unconstitutional, thus, making it obvious that MCL 500.3135(2)(a) will also likely fall within the majority’s effort to expunge the jurisprudence of the past decade.
I also disagree with the majority that “the disputed fact does not need to be outcome determinative in order to be material. . . .” MCL 500.3135(2)(a)(ii) states that “whether an injured person has suffered serious impairment of body function ... [is a] question[] of law for the court if the court finds . .. [that the] factual dispute ... is not material to the determination as to whether the person has suffered a serious impairment of body function . . . .” That is, “[a]bsent an outcome-determinative genuine factual dispute, the issue of threshold injury is now a question of law for the court.” Kern v Blethen-Coluni, 240 Mich App 333, 341; 612 NW2d 838 (2000) (emphasis added). Although the majority cites Black’s Law Dictionary (8th ed) in support of its proposition that “the disputed fact does not need to be outcome determinative in order to be material,” Black’s Law Dictionary (6th ed) states the very opposite — “[m]aterial fact is one upon which outcome of litigation depends.” See also Black’s Law Dictionary (8th ed), which defines “material” as “[h]aving some logical connection with the consequential facts,” and Random House Webster’s College Dictionary (1991), which defines “material” as “likely to influence the determination of a case[.]”

 The majority does take issue with Kreiner’s conclusion that “[subjective complaints that are not medically documented are insufficient” to establish that an impairment is “objectively manifested.” Kreiner, 471 Mich at 132. However, given that the majority agrees that “plaintiffs must ‘introduce evidence establishing that there is a physical basis for their subjective complaints of pain and suffering,’ ” quoting DiFranco, 427 Mich at 74, and I am uncertain what evidence other than medical documentation would establish such a “physical basis,” it is not clear why *242 the majority objects to Kreiner’s statement that medical documentation is required. See also DiFranco, 427 Mich at 75 (“The ‘serious impairment of body function’ threshold requires the plaintiff to prove that his noneconomic losses arose out of a medically identifiable injury which seriously impaired a body function.”) (emphasis added).

 The majority also indicates that “many other considerations could typically be relevant to determining how an impairment affects a person’s ability to live in his or her pre-incident normal manner of living.” The majority does not offer any further explanation as to what these “many other considerations” might conceivably be.

 Although Kreiner, 471 Mich at 135, specifically held that “an injury need not be permanent,” the majority nonetheless criticizes it for “effectively creating] a permanency requirement.”

 Contrary to the majority’s contention, this dissent very clearly provides in the above language “specific, substantive arguments” in support of this conclusion.

 The authoring justice states, “I have repeatedly stated that legislative history should only be used to interpret a statute when statutory language is ambiguous.” Although, in some cases, he has asserted this, see, for example, People v Gardner, 482 Mich 41; 753 NW2d 78 (2008) (CAVANAGH, J., dissenting); Bukowski v Detroit, 478 Mich 268; 732 NW2d 75 (2007) (Cavanagh, J., concurring); People v Derror, 475 Mich 316; 715 NW2d 822 (2006) (Cavanagh, J., dissenting); Lansing Mayor v Pub Serv *246 Comm, 470 Mich 154; 680 NW2d 840 (2004) (CAVANAGH, J., dissenting), in other cases, he has suggested that legislative history can be considered even though the statute is not ambiguous, see, for example, Jackson v Green Estate, 484 Mich 209, 230; 771 NW2d 675 (2009) (CAVANAGH, J., dissenting) (“Not only is this interpretation consistent with the plain language of the statute, it is also consistent with the legislative history of the statute.”) (emphasis added); Koester v City of Novi, 458 Mich 1; 580 NW2d 835 (1998); Elias Bros Restaurants v Treasury Dep’t, 452 Mich 144; 549 NW2d 837 (1996) (Cavanagh, J., concurring); People v Barrera, 451 Mich 261; 547 NW2d 280 (1996); People v Sloan, 450 Mich 160; 538 NW2d 380 (1995); Orzel v Scott Drug Co, 449 Mich 550; 537 NW2d 208 (1995); Gardner v Van Buren Pub Sch, 445 Mich 23; 517 NW2d 1 (1994); Grand Trunk W R Co v Fenton, 439 Mich 240; 482 NW2d 706 (1992); Romein v Gen Motors Corp, 436 Mich 515; 462 NW2d 555 (1990). Further, given the definition of “ambiguous” supported by the authoring justice, see Petersen, 484 Mich at 329 (Kelly, C.J., lead opinion) (quoting Yellow Freight Sys, Inc v Michigan, 464 Mich 21, 38; 627 NW2d 236 [2001], for the proposition that “ ‘[w]hen a statute is capable of being understood by reasonably well-informed persons in two or more different senses, [a] statute is ambiguous’ ”), and the different understandings given to the statute here by the majority and dissenting justices, I fail to see how, by his own standards, the authoring justice can conclude that the statute is unambiguous, unless, of course, he does not believe that the dissenting justices are “reasonably well-informed persons.”

 I find it interesting that the justice authoring the majority opinion once chastised me for “leavfing] no dictionary unturned,” with regards to an opinion in which I cited two different dictionaries, People v Raby, 456 Mich 487, 501; 572 NW2d 644 (1998) (Cavanagh, J., dissenting), and, here, he cites seven different dictionaries and still cannot quite find a definition that serves his purpose. While considering relevant dictionary definitions can be a valuable tool of interpretation, the majority’s generous use of dictionaries here is noteworthy because the majority has questioned the propriety and usefulness of this tool in the past. Jones v Olson, 480 Mich 1169, 1176 (2008) (“In the legal context, using a dictionary to unwaveringly determine the legislative intent behind a statute is nothing more than barely hidden judicial activism.”) (Weaver, J., dissenting, joined by then-Justice Kelly and Justice Cavanagh).

 I use the phrase “extra-textual” factors only because this is the phrase the majority uses. However, in truth, I do not believe that the factors articulated in Kreiner are at all “extra-textual,” because these have been derived directly from the text of the statute itself.

 Indeed, as I explained in my dissent in Petersen, 484 Mich at 380, the majority’s “interpretative” process seems to consist of “picking and choosing at [its] discretion from among some uncertain array of tools lying ‘beyond the plain language of the statute [or contract].’ ” (Citation omitted.) The problem with this approach is that “[t]he litigants will, of course, have no notice beforehand of which tools are to be employed, for the justices themselves will not know this beforehand.” Id. The rule gleaned from the instant case is apparently that it is appropriate to employ “extra-textual” factors, but only where the majority wishes to do so. The parties will be made aware of the majority’s inclinations, but only after a decision has been issued.

 In his dissent in Smith v Khouri, 481 Mich 519, 544; 751 NW2d 472 (2008), Justice CAVANAGH affirmed his satisfaction with the Wood “factors,” even though these factors are obviously “extra-textual.”

 As explained above, there are other discrepancies between Kreiner and the majority’s opinion, i.e., the DiFranco/Cassidy and the “trajectory/entire” discrepancies. However, these two discrepancies are intertwined with our disagreement about whether temporal considerations should be considered. By returning our law to DiFranco, at which time the plaintiffs “general ability to lead his or her normal life” was not at issue, it is much easier for the majority to claim that temporal considerations are wholly or largely irrelevant. In addition, because the majority believes that it is inappropriate to consider either the “trajectory” or the “entire” person’s life, it believes that temporal considerations, such as the duration of the impairment, are wholly or largely irrelevant. However, because we conclude that the statute clearly precludes a return to DiFranco, since the Legislature has very clearly indicated that the plaintiffs “general ability to lead his or her normal life” is at issue, we believe that temporal considerations are relevant. Similarly, because we believe that the “trajectory” or the “entire” person’s life should be considered, we believe that temporal considerations, such as the duration of the impairment, are, in fact, highly relevant.

 The majority essentially agrees with: (1) Kreiner’s analysis of MCL 500.3135(2)(a), i.e., if there is no material factual dispute, whether a person has suffered a serious impairment of body function should he determined by the court as a matter of law; (2) Kreiner’s analysis of the language “an objectively manifested impairment of an important body function”; (3) Kreiner’a conclusion that the serious impairment of body function threshold entails a subjective analysis; (4) Kreiner’s conclusion that determining whether a plaintiffs general ability to lead his or her normal life has been affected “necessarily requires a comparison of the plaintiffs life before and after the incident”; and (5) Kreiner’s conclusion that permanency is not required.

 It certainly is a “threshold” bearing no resemblance to the other two thresholds — “permanent serious disfigurement” and “death.” See MCL 500.3135(1).

 The majority criticizes Kreiner as “deifying] practical workability” on the basis that “Kreiner has led to inconsistent interpretation of the statutory language, with similarly situated plaintiffs being treated differently by different courts.” However, in his opinion in DiFranco, 427 Mich at 56-57, Justice Cavanagh has already provided an explanation for why this might be the case:
Conflicting results have also arisen among cases involving similarly injured plaintiffs. This is undoubtedly because no two plaintiffs are injured or recover in precisely the same manner. These conflicting results indicate that threshold issues are often questions upon which reasonable minds can differ.
Moreover, if the Court of Appeals is inconsistently or incorrectly applying Kreiner, this Court has a mechanism to rectify such errors — reversing such decisions, not overruling precedent and substituting an incomprehensible new standard bearing no relationship to the law being interpreted.

31 See also DiFranco, 427 Mich at 95 (Williams, C.J., concurring in part and dissenting in part) (“In the statutory language, ‘serious impairment of body function’ appears with the other threshold requirements of ‘permanent serious disfigurement’ and ‘death,’ leaving the strong implication, under the rule of ejusdem generis, that while the impairment need not be permanent or fatal, it was not to be transient or trivial either.”).

 As already discussed, in January 2006, plaintiff reported to his surgeon that his ankle was not giving him any pain; in March 2006, plaintiff reported during his FCE that his pain was 3 out of 10; in June 2006, plaintiff reported to his physiatrist that his pain was 6 out of 10; in August 2006, plaintiff reported during his FCE that his pain was as low as zero out of 10 (at which point, he returned to work); and in October 2006, plaintiff reported during his deposition that his life was “normal” with some pain. These drastically inconsistent reports of pain demonstrate why, with regard to the “extent of any residual impairment,” “[s]elf-imposed restrictions, as opposed to physician-imposed restrictions, based on real or perceived pain do not establish this point.” Kreiner, 471 Mich at 133 n 17.

 It is of interest that this is the second time the authoring justice has authored an opinion overruling an earlier case and thus made it easier for a plaintiff to establish a serious impairment of body function. In *263 DiFranco, he authored an opinion overruling Cassidy. Chief Justice Williams complained: “Four years after this Court issued its opinion in Cassidy v McGovern, 415 Mich 483; 330 NW2d 22 (1982), the majority sees fit to overrule the decision of five members of a six-member court and adopt the position of the dissent in that case.” DiFranco, 427 Mich at 92 (WILLIAMS, C.J., concurring in part and dissenting in part). In this case, the authoring justice again sees fit to overrule a case that was decided only six years ago and to adopt his own dissenting opinion from that case. While it is by now clear what the authoring justice believes the no-fault policies of this state ought to be, it is considerably less clear what connection these views bear to those of the people and their Legislature.

 The fact that the lead opinion relies far more on Chief Justice Kelly’s opinion in Petersen, which only Justice Cavanagh joined, than on the majority opinion in Robinson should not go unnoticed. For a discussion of Chief Justice Kelly’s Petersen standard for overruling precedent, see my dissent in Petersen, 484 Mich at 350.
Concerning the statements of Justices Hathaway and Weaver about stare decisis:
Justice Hathaway contends that stare decisis constitutes a “policy consideration” and that the “particular analytical approach will differ from case to case.” Similarly, Justice WEAVER contends that stare decisis constitutes a “principle of policy” and that there is no need for a “standardized test for stare decisis,” as long as justices exercise “judicial restraint, common sense, and a sense of fairness____” The problem with these “approaches” is that “litigants will, of course, have no notice beforehand of which [“analytical approach”] will be employed, for the justices themselves will not know this beforehand.” Petersen, 484 Mich at 380 (Markman, J., dissenting).... Although Justice Weaver is correct that “[t]here are many factors to consider when deciding whether or not to overrule precedent,” and Justice Hathaway is equally correct that the application of stare decisis must take place on a “case-by-case basis,” this does not obviate the need to at least reasonably attempt to apprise the parties, and the citizens of this state, before the fact what some factors might be, as this Court did in Robinson and as the Chief Justice and Justice Cavanagh did in Petersen. And whatever else can be understood of Justice Hathaway’s and Justice Weaver’s “approaches” to stare decisis, the application of *264 these “approaches” has resulted in 13 precedents of this Court being overruled during this term alone and 6 other precedents being teed up for possible overruling during the next term, doubtless a record pace for dismantling the caselaw of this state. [Univ of Mich Regents v Titan Ins Co, 487 Mich 289, 340 n 10; 791 NW2d 897 (2010) (Markman, J., dissenting).]

 “[p]rincipies of stare decisis in matters of statutory interpretation, particularly where the Legislature has not responded to a prior interpretation, weigh against overruling precedent absent sound and specific justification.” Paige, 476 Mich at 540-541 (Cavanagh, J., concurring in part and dissenting in part) (emphasis added); see also Devillers v Auto Club Ins Ass’n, 473 Mich 562, 613-614; 702 NW2d 539 (2005) (Cavanagh, J., dissenting); Neal v Wilkes, 470 Mich 661, 676-677; 685 NW2d 648 (2004) (Cavanagh, J., dissenting); People v Moore, 470 Mich 56, 78-79; 679 NW2d 41 (2004) (Cavanagh, J., dissenting); Jones v Dep’t of Corrections, 468 Mich 646, 665; 664 NW2d 717 (2003) (Cavanagh, J., dissenting); Mack v Detroit, 467 Mich 186, 221-222; 649 NW2d 47 (2002) (Cavanagh, J., dissenting); Robertson v DaimlerChrysler Corp, 465 Mich 732, 767-768; 641 NW2d 567 (2002) (Cavanagh, J., dissenting). Significantly, the authoring justice has gone so far as to suggest that “when this Court first *265 interprets a statute, then the statute becomes what this Court has said it is,” and that, absent further legislative action, “ ‘[Waving given our view on the meaning of a statute, our task is concluded, absent extraordinary circumstances.’ ” Paige, 476 Mich at 537 (Cavanagh, J., concurring in part and dissenting in part), quoting Boys Markets, Inc v Retail Clerks Union, 398 US 235, 257-258; 90 S Ct 1583; 26 L Ed 2d 199 (1970) (Black, J., dissenting) (emphasis omitted). One cannot reconcile this view of legislative acquiescence and stare decisis with the majority’s decision to overrule Kreiner. Kreiner was this Court’s first interpretation of the amended MCL 500.3135, and, although bills were subsequently introduced that would have abolished Kreiner, such bills were repeatedly rejected by the Legislature. See, e.g., SB 1429 (2004); SB 618, HB 4846, and HB 4940 (2005); SB 445, HB 4301, and HB 4999 (2007); and SB 83 and HB 4680 (2009). Therefore, what is the majority’s “sound and specific justification” for departing from Kreiner? Paige, 476 Mich at 541 (Cavanagh, J., concurring in part and dissenting in part). What are the “extraordinary circumstances” that make it appropriate to do so? Id. at 538 (citation, quotation marks, and emphasis omitted). While, in my view, this Court has correctly repudiated the doctrine of legislative acquiescence, see Donajkowski v Alpena Power Co, 460 Mich 243, 258-261; 596 NW2d 574 (1999), there is no principled reason why the majority, whose members are convinced advocates of this doctrine, chooses to ignore the Legislature’s repeated rejection of attempts to abolish Kreiner, just as there is no principled reason why the majority chooses to ignore the Legislature’s actions in amending MCL 500.3135 and the other forms of available legislative history.

 Rowland v Washtenaw Co Rd Comm, 477 Mich 197, 256; 731 NW2d 41 (2007) (Kelly, J., concurring in part and dissenting in part) (“The law has not changed. Only the individuals wearing the robes have changed.”); Paige, 476 Mich at 532-533 (Cavanagh, J., concurring in part and dissenting in part) (“The only change has been the composition of this Court. And unfortunately, this is the only reasonable answer to the question why a decision from this Court decided just eight years earlier and involving the same issue is now being overruled. But make no mistake, this answer is alarming, and it has become increasingly common.”). As observed, after the composition of this Court changed when Justice Hathaway replaced former Chief Justice Taylok on January 1, 2009, this Court granted plaintiffs motion for reconsideration even though such motion had not raised any new legal arguments. 485 Mich 851 (2009).

 See Detroit Free Press, December 10,2008, p A2, where Chief Justice Kelly promised to “undo ... the damage that the Republican-dominated court has done.”

38 I dissented in Juarez, 483 Mich at 971, stating:
[T]he majority’s disdain for Smith [v Khouri, 481 Mich 519; 751 NW2d 472 (2008)] is apparently viewed as adequate justification for ignoring Smith. Rather than forthrightly overruling this *268 decision, something the new majority is apparently loath to do (perhaps because several majority justices repeatedly and loudly proclaimed fealty to stare decisis, and dissented, whenever the former majority overruled a precedent), it is increasingly becoming the modus operandi of this Court that relevant precedents simply be ignored.

39 The majority also failed to follow Rowland in Ward v Mich State Univ, 485 Mich 917 (2009).

40 On the other hand, as I stated in Rowland, 477 Mich at 226-227:
[T]he [former] majority has been disciplined in stating expressly when a precedent has heen overruled. The [former] majority has never attempted to obscure when a precedent was overruled or to minimize the number of such precedents by dubious “distinguishing” of prior caselaw. Rather, it has been forthright in identifying and critiquing precedents that were viewed as wrongly decided and warranting overruling.

 The Detroit Free Press took note of the majority’s actions and stated as follows in an October 11, 2009, editorial, Restoring judicial restraint-.
Even before the new term began, the new Democratic majority (buttressed by the renegade Weaver) had signaled its own impatience to begin dismantling the Engler Court’s legacy when it agreed to reconsider an appeal the court rejected just a month before Taylor’s departure. The revived appeal appears to hinge on the court’s willingness to reverse two of the Engler court’s more recent decisions.
Democrats can hardly reinvigorate stare decisis — the reasonable conviction that the rules of the game shouldn’t change every time a new referee takes the field — by reversing every questionable call its predecessors made.

 This Court’s grant order in Anglers of the AuSable, Inc v Dep’t of Environmental Quality, 485 Mich 1067 (2010), inquired whether Mich Citizens was correctly decided, and the majority denied a motion to dismiss that case even though the case is now clearly moot. See Anglers of the AuSable, Inc v Dep’t of Environmental Quality, 486 Mich 982, 987-994 (2010) (Young, J., dissenting). Apparently, the majority just could not wait until next term to overrule Mich Citizens because it appears already to have done so in Lansing Sch Ed Ass’n.

 This Court’s grant order in Anglers, 485 Mich at 1067, also inquired whether Preserve the Dunes was correctly decided, and, as noted, the majority denied the motion to dismiss in that case even though it is now clearly moot. See Anglers, 486 Mich at 987-994 (2010) (Young, J., dissenting).

 Colaianni v Stuart Frankel Dev Corp, 485 Mich 1070 (2010), inquired “whether Trentadue v Buckler Automatic Lawn Sprinkler Co, 479 Mich 378, was correctly decided.”

 This Court’s grant order in Wilcox v State Farm Mut Auto Ins Co, 486 Mich 870 (2010), inquired “whether Griffith v State Farm Mut Auto Ins Co, 472 Mich 521 (2005), was correctly decided.” This order is the majority’s second tee-up of Griffith. The majority first requested that the parties brief whether Griffith was correctly decided in Hoover v Mich Mut *274 Ins Co, 485 Mich 881 (2009), but that case was subsequently dismissed after a settlement, Hoover v Mich Mut Ins Co, 485 Mich 1036 (2010). However, the majority wasted little time in finding another case to use as a vehicle for reconsidering Griffith.

 This Court’s grant order in Idalski v Schwedt, 486 Mich 916 (2010), inquired “whether Rory v Continental Ins Co, 473 Mich 457 (2005), should be reconsidered.”

 This Court’s grant order in Pollard v Suburban Mobility Auth, 486 Mich 963 (2010), inquired “whether this Court should reconsider Rowland v Washtenaw Co Rd Comm, 477 Mich 197 (2007).”

 See, e.g., People v Davis, 472 Mich 156, 190; 695 NW2d 45 (2005), where then-justice Kelly opined in dissent that overruling cases “destabilizes our state’s jurisprudence. It suggests to the public that the law is at the whim of whoever is sitting on the Supreme Court bench. Surely, it erodes the public’s confidence in our judicial system.”

 Given that it has always been our position that Robinson does not establish a “mechanical” process, it is not surprising that the majority has been able to identify a single case in which we overruled precedent without specifically citing Robinson.

 See, for example, Ruling Clouds Pot Smoking, Driving Law, Detroit News, July 29, 2010 (indicating that the majority’s recent overruling of Derror in Feezel “has police officers scratching their heads in confusion” and reporting that “[t]he ruling mostly leaves law enforcement officers in a legal limbo, said Sgt. Christopher Hawkins, legislative liaison for the state police”) available at <http://www.detnews.com/article/ 20100729/METRO/7290387#ixzz0v6dvSnGK> (accessed July 29, 2010).

 The majority argues that the legislative compromise of 1973 that led to the adoption of the no-fault act itself cannot he cited to trump the 1995 enactment of MCL 500.3135(7). We agree, but it is our position that the *282 1995 enactment of MCL 500.3135(7), which in large measure rejected DiFranco and made it more difficult for plaintiffs to prevail in noneconomic loss benefit cases, is entirely consistent with the compromise. The majority’s opinion is not in accord with either the compromise or MCL 500.3135(7).

 See, e.g., Tebo v Havlik, 418 Mich 350, 366; 343 NW2d 181 (1984) (opinion by Brickley, J.) (recognizing that a primary goal of the no-fault act is to “provid[e] an equitable and prompt method of redressing injuries in a way which made the mandatory insurance coverage affordable to all motorists”); Celina Mut Ins Co v Lake States Ins Co, 452 Mich 84, 89; 549 NW2d 834 (1996) (holding that “the no-fault insurance system... is designed to provide victims with assured, adequate, and prompt reparations at the lowest cost to both the individuals and the no-fault system”); O’Donnell v State Farm Mut Auto Ins Co, 404 Mich 524, 547; 273 NW2d 829 (1979) (recognizing that the Legislature has provided for setoffs in the no-fault act: “Because the first-party insurance proposed by the act was to be compulsory, it was important that the premiums to be charged by the insurance companies be maintained as low as possible!/,] [otherwise, the poor and the disadvantaged people of the state might not be able to obtain the necessary insurance”).

 In Univ of Mich Regents, 487 Mich at 293, the majority has overruled Cameron. This overruling will also lead to significant cost increases to no-fault policies. Indeed, defendant Titan Insurance Company argued in Univ of Mich Regents that overruling Cameron would have “devastating” effects on the orderly adjustment of no-fault claims and “threaten the viability” of the Michigan Assigned Claims Facility and the Michigan Catastrophic Claims Association (MCCA) because the gutting of the one-year-back rule will lead to a flood of decades old no-fault claims seeking expensive family attendant care benefits. Id. at 342 n 12 (Markman, J., dissenting). In addition, in Wilcox, 486 Mich at 870, the majority has asked the parties to brief whether Griffith “was correctly decided.” No-fault insurance costs can be expected to rise even further if the majority overrules Griffith, which considered the parameters of an “allowable expense” under MCL 500.3107(l)(a).

 As a consequence of the majority’s decision in United States Fidelity (On Rehearing), the MCCA substantially increased the mandatory annual assessment no-fault policy holders must pay to the association. According to the MCCA’s own website, the annual assessment has increased 40 percent in the last two years (from $104.58 per insured vehicle effective July 1, 2008, to June 30, 2009, to $143.09 per insured vehicle effective July 1, 2010, to June 30, 2011). <http:// www.michigancatastrophic.com> (accessed June 28, 2010).

 As stated in Justice Young’s dissent in United States Fidelity (On Rehearing), 484 Mich at 26, this increase in premiums is not pertinent to our analysis of the substantive issue beyond making the point that the majority is undoing the compromise embodied by the no-fault act. But having lost the battle with the majority over the legal analysis of the no-fault statute, the financial consequences of the majority’s decision should not go unremarked.

 According to the Insurance Institute of Michigan’s 2009 Fact Book, the Insurance Research Council released a study in 2008 estimating Michigan’s uninsured motorists rate at 17 percent. <http://www. iiminfo.org/Portals/44/Fact%20Book%204%20Auto%20(19-29).pdf> (accessed June 28, 2010). Indeed, according to a July 11, 2010 editorial in the Detroit News, “Statistics suggest more than half the drivers in Detroit ignore state law by driving without coverage because they can’t afford the premiums. That’s a problem for their fellow motorists and for the state.” < http ://detnews. com/article/20100711/OPINION 01/With-credit-scoring-issue-decided-policymakers-should-explore-other-ways-to-trim-auto-insurance-costs#ixzzOtUKFqijI> (accessed July 14, 2010).

 According to the Insurance Institute of Michigan, as of 2008, Michigan had 8.2 million registered motor vehicles, chttp:// www.iiminfo.org/Portals/44/registered%20vehicles%2008.pdf> (accessed June 28, 2010).

 If one reviews the new majority’s decisions, it is difficult not to conclude that the only coherent theme of their jurisprudence is the fostering of litigation. They have virtually guaranteed as much by introducing uncertainty, doubt, and confusion into the law, and by gratuitously interjecting irrelevant considerations into their opinions. See, e.g., O’Neal, 487 Mich at 506 n 22 (opinion by Hathaway, J.) (gratuitously calling into question the viability of Wickens, a case having no relevance to that dispute); Zahn v Kroger Co, 483 Mich 34; 764 NW2d 207 (2009) (gratuitously observing that the parties to the contract were business entities “with equal bargaining power,” as if the latter circumstance, not at all relevant in that case, might be relevant in a different case); Anglers, 486 Mich at 982 (refusing to dismiss a moot case); Scott v State Farm Mut Auto Ins Co, 483 Mich 1032 (2009) (relaxing the causal connection that must exist between an injury sustained and the ownership, maintenance or use of a motor vehicle in no-fault cases); Decosta v Gossage, 486 Mich 116; 782 NW2d 734 (2010) (refusing to enforce notice-of-intent requirements under MCL 600.2912b(2); Chambers v Wayne Co Airport Auth, 483 Mich 1081 (2009), Beasley v Michigan, 483 Mich at 1025, and Ward, 485 Mich at 917 (all refusing to enforce pre-litigation notice requirements); Adair v Michigan, 486 Mich 468; 785 NW2d 119 (2010) (reducing a Headlee Amendment plaintiffs burden of proof); Lansing Sch Ed Ass’n, 487 Mich at 352-353 (nullifying historical standards for determining whether a plaintiff has “standing” to bring a lawsuit); Univ of Mich v Titan Ins Co, 487 Mich at 292-293 (eroding the no-fault act’s one-year-back rule); O’Neal, 487 Mich at 504-506 (opinion by Hathaway, J.) (concluding that whichever lost-opportunity formula benefits the plaintiff the most in any particular case is the correct formula to be utilized); Vanslembrouck v Halperin, 483 Mich 965 (2009) (incorrectly characterizing MCL 600.5851(7) as a statute of limitations that can be tolled rather than a saving provision that cannot he tolled); Sazima v Shepherd Bar & Restaurant, 483 Mich 924 (2009) (expanding what injuries can be *286 considered to have occurred “in the course of employment” for purposes of workers’ compensation); and the 2010 amendments of MCR 2.112 and MCR 2.118, 485 Mich cclxxv, eclxxvi (undermining affidavit of merit requirements). In the instant case, of course, the majority, by undermining the no-fault compromise struck by the Legislature, makes it easier for plaintiffs to sue for noneconomic loss benefits.

 See 2009 Annual Report of the Michigan Supreme Court, pp 35-36, available at <http://www.courts.michigan.gov/scao/resources/pubhcations/ statistics/2009/2009execsum.pdf> (accessed June 28, 2010).

 It was reported that, as of 2007, the state’s vehicle fleet totaled 11,856. <http://www.greatlakeswiki.org/index.php/Michigan_state_fieet_ efficiency> (accessed June 28, 2010).

 I reiterate that expected increases in no-fault premiums are not pertinent to our analysis of the legal issues in this case, beyond making the point that the majority is undoing the legislative compromise embodied by the no-fault act and that there will be significant practical consequences to doing this.